652 F.Supp. 946 (1986)
Chester DeGEARE, et al., Plaintiffs,
v.
ALPHA PORTLAND INDUSTRIES, INC., et al., Defendants.
No. 85-0043C(3).
United States District Court, E.D. Missouri.
December 23, 1986.
*947 Jay E. Sushelsky, St. Louis, Mo., for plaintiffs.
Joseph B. Moore, Asst. U.S. Atty., St. Louis, Mo., for U.S.
Bryan, Cave, McPheeters & McRoberts, Dennis C. Donnelly, Thomas E. Wack, Hollye Stolz Atwood & Patricia M. Weik, Edwin L. Noel, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for Alpha Portland Ind., Inc.
Edward K. Fehlig, Ziercher, Hocker, Human, Michenfelder & Jones, Clayton, Mo., for Equitable Life Assur. Soc. of the U.S.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court after a three-day nonjury trial to determine the merits of class plaintiffs' claim on Count I of their complaint.[1]
Pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, et seq., named plaintiffs, retired salaried, non-union employees of defendant Alpha Portland Industries, Inc. (Alpha), in general seek relief on behalf of themselves and others for defendants' allegedly improper termination of life and health insurance benefits previously provided to Alpha retirees and their dependents. Defendant The Equitable Life Assurance Society of the United States (Equitable) provided and participated in the administration of the insurance policies at issue here. Plaintiffs urge Alpha's obligation to furnish retirement insurance benefits to the salaried retirees in plaintiff class arises out of the parties' relationship over many years and the creation of non-terminable rights through that relationship. Defendants deny liability.
Having carefully considered the record herein, including the pleadings, the parties' joint stipulation of uncontested facts, the relevant exhibits, depositions and testimony, and the parties' argument, the Court hereby makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. Prior to their retirement, named plaintiffs each worked as a salaried employee of the cement division of defendant Alpha Portland Industries, Inc. (Alpha).
2. Defendant Alpha was at all relevant times a corporation and an employer engaged in commerce and in activities affecting commerce. Until 1972, defendant Alpha was known as Alpha Portland Cement Company, and since 1985 it is known as Slattery Group, Inc.
3. During all relevant times, Alpha administered the Insurance and Health Program for Salaried Employees ("Program") and its predecessor insurance programs for salaried employees.
4. Defendant The Equitable Life Assurance Society of the United States (Equitable) participated in the administration of the Program.
5. Named plaintiffs represent a certified class consisting of:
All retired, salaried employees of defendant Alpha Portland Cement Company, a division of Alpha Portland Industries, Inc. ("Alpha"), who at the time of retirement from Alpha had sufficient years of *948 continuous service with Alpha to entitle them to retiree insurance benefits under the Alpha Insurance and Health Program for Salaried Employees (the "Program"), and the executors, heirs, dependents and beneficiaries of deceased retirees described above whose decedents died since May 1, 1982, with the exception of Alpha retired, salaried employees who previously have settled and/or compromised their claims against Alpha arising out of Alpha's May 1, 1982, termination of retiree insurance benefits. Salaried employees who retired from Alpha after the May 1, 1982, termination of retiree insurance benefits under the program are not included within the class.
Due to settlements reached with two class members in earlier litigation, see Bettye Kane, et al. v. Alpha Portland Industries, Inc., cause no. 83-2647C(B) (E.D.Mo.), and notices received by the Court that seventeen potential class members "opt-out" of this class, there remain approximately 169 retirees in plaintiff class.
6. For many years, Alpha was engaged in the manufacture and sale of portland cement. Although it once owned and operated as many as ten cement plants, four were closed or sold prior to 1981. The remaining plants, including Jamesville, New York; Birmingham, Alabama; St. Louis, Missouri; Orange, Texas; Cementon, New York; and Limekiln, Maryland, were shut down or disposed of during 1981 and 1982.
7. In 1946, Alpha instituted its "Plan for Group Life Insurance, Group Hospital Expense and Surgical Benefits" (the "Plan"), to provide certain health and life insurance benefits to salaried employees.
8. Except for the Major Medical Expense Insurance Plan that became effective December 21, 1957, between 1946 and 1966, employees contributed toward the Plan through paycheck deductions. Starting in 1966 and through 1978, the Plan required no employee contributions except with respect to life and salary continuance insurance.
9. From 1946 through 1972, individual certificates and descriptive booklets, rather than formal Plan documents, were distributed to Alpha's salaried employees. The individual certificates "contain[ed] complete details of the benefits provided under [the] Plan." For the Plan as revised in 1948, 1950, and 1952, the booklets stated they gave "all the details" or furnished the "full details" of the Plan to be underwritten by Equitable. Subsequent booklets for the Plan as revised indicated they outlined the "principal features" of the Plan evinced by the contracts between Alpha and Equitable. The last page of each booklet for the Plan as revised in 1948, 1950, 1952, and 1956, and the first pages of later booklets, referred the employee to the contracts between Equitable and Alpha for the terms or "exact provisions" of each Plan.
10. The record has two certificates for the Plan effective during this period, in particular during 1961 and 1963. The certificates note they are not a contract of insurance and specify the insurance policy of which the certificate is evidence. Except as noted below, the certificates do not expressly refer to insurance benefits for retirees. The 1963 Plan certificate provides the following as the only termination provision:
Termination of Insurance: The insurance of an Insured shall immediately terminate on the earliest of the following dates: (a) the date the policy is terminated as provided therein; (b) the date the Insured ceases to be a member of a class described in the policy; (c) the premium due date if the Policyholder fails to pay the required premium for the Insured, except as a result of inadvertent error; (d) the first day of the month following the Insured's 65th birthday.
The 1961 Plan certificate contains the following statements regarding termination:
[I] TERMINATION: The insurance of any Employee under a Group policy shall cease automatically upon the occurrence of any of the following events:
(a) the termination of the policy, (b) the cessation of premium payments on account *949 of the Employee's insurance thereunder, (c) the termination of his employment in the classes of Employees insured thereunder.
Note: In case of cessation of active work the Employee should consult the Employer to see what arrangement, if any, can be made to continue the insurance.
(emphasis in original); regarding hospital expense, accident, and health insurance:
[II] TERMINATION AND CHANGE OF POLICY. On any premium due date the Employer may terminate the policy or, subject to the Society's approval, may modify, amend or change the provisions, terms and conditions of the policy. No consent of any Employee or any other person referred to in the policy shall be required to effect termination of the policy or any modification, amendment, or change thereof.
and regarding Major Medical Expense insurance:
[III] The Major Medical Expense Insurance of any Employee shall cease automatically upon the occurrence of any one of the following events:
1. the termination of Major Medical Expense Insurance under the Group policy,
2. the termination of the Employee's insurance under the Group policy,
3. the cessation of premium payments on account of the Employee's Major Medical Expense Insurance,
4. the Employee's retirement,
5. the payment of the Maximum Amount of Benefits with respect to the Employee.
The 1961 Plan certificate also specified (a) limited extensions of benefits under certain circumstances, for instance, employee disability on the date insurance terminates; and (b) coverage and termination provisions for employees' dependents.
11. Each booklet for the 1946 Plan, as revised through 1970, noted that Equitable (a) would decide the amount of reimbursement paid for "cutting operations" not listed in the booklet; and (b) would provide to any terminated employee upon application within thirty-one days after termination and "without medical examination," certain life insurance up to the amount provided under the Plan if bought by the employee.
12. The booklet for the 1946 Plan and its amendments through 1956 explicitly provided:
[T]he Company hopes to continue the plan indefinitely but reserves the right to change, modify or discontinue it if future conditions make such action necessary or if reduction of Company earnings make it impossible to continue.
This language does not appear in later booklets.
13. The 1946 Plan booklet stated that life insurance benefits, and Hospital and Surgical Expense Insurance benefits would continue for no more than six months without cost to the employee during
any periods of temporary layoff by the [Alpha] Company which may be due to a curtailment in production or which may be due to a shutdown occurring in the normal course of business [and only during such periods].
(hereinafter "extension provisions"). The booklet further stated that life insurance "will be continued for 31 days after termination of employment" and subject to specified exceptions, the Hospital and Surgical Expense Insurance "will be terminated upon termination of employment" (hereinafter "termination statements"). Otherwise, the booklet contains no explicit reference to termination of benefits or to the availability, if any, of these benefits to retired salaried employees.
14. The 1948, 1950, 1952, and 1956 booklets contained the same extension provisions and termination statements as the 1946 Plan booklet. The 1948 and 1950 Plan booklets also stated:
Employees who retire with the consent of the Alpha company and have completed 25 years of service at the time of retirement will have the privilege of continuing one-half the amount of Group Life Insurance for which they were insured immediately prior to retirement, at *950 the regular contribution to such coverage of $.50 per month per thousand [of insurance].
15. With respect to Hospital and Surgical Insurance for retirees, the 1950 Plan booklet provided:
Employees who retire with the consent of the Alpha Company will have the privilege of continuing their Hospitalization and Surgical Insurance for themselves and dependents. However, the hospital benefits for each covered person will be limited to a total of 31 days in any calendar year and Surgical Expense Benefits not to exceed one maximum surgical claim in any calendar year.
16. The 1950, 1952, and 1956 Plan booklets set forth an explanation of Sickness and Accident Insurance which
will be suspended during any period of temporary layoff or leave of absence but will be reinstated immediately upon the employee's return to active employment. It will be terminated upon termination of employment.
17. The 1952 and 1956 Plan booklets contained the same provision for continuing Life Insurance for retirees, as was contained in the 1948 and 1950 Plan booklets, except that employees having completed 15 years, rather than 25 years, of continuous service were now eligible for the coverage. As with the 1950 Plan, the 1952 Plan booklet provided for continuation of Hospitalization and Surgical Insurance for retirees, except the hospital benefits for each covered person were expressly limited to "a total of 31 days and a maximum reimbursement for additional charges not to exceed $100 in any one calendar year[.]"
18. The continuation of Hospitalization and Surgical Insurance for retirees was set forth in the 1956 booklet as it had been in the 1952 Plan booklet, except now each covered person was limited
to a total of 60 days and a maximum reimbursement of $300 for additional charges [in Hospital Expense Benefits and] a maximum of $250 in any one calendar year [for Surgical Expense Benefits].
19. The new Major Medical Expense Insurance Plan that became effective on December 21, 1957, did not require employee payments, did not explicitly provide for benefits to retirees, and stated it "ceases on termination of your active employment with Alpha," except for a limited extension of benefits for totally disabled employees who terminate such employment.
20. Similar to earlier booklets, the 1961, 1963, 1966, 1968, and 1970 booklets stated that "[f]or 31 days after you leave Alpha your group life insurance continues in force." With regard to Hospital Expense Insurance, Surgical Expense Insurance, Maternity Expense Insurance, and Major Medical Expense Insurance, the 1961, 1963, 1966, 1968, and 1970 Plan booklets explicitly provided that under certain circumstances, e.g., disability or pregnancy on the termination date, these benefits would be extended to a limited extent beyond the date the insurance terminated. On the last page of the booklets was the "termination of insurance" provision:
Group insurance for you and your dependents terminates upon termination of your active service except as previously discussed. Insurance on dependents terminates when they cease to be dependents as defined. Your group insurance certificate and this booklet set forth instances where protection continues after termination of insurance.
These booklets separately specified the continuation of benefits if a covered employee became disabled or a retiree.
21. In relevant part, the 1961 Plan booklet stated:
Upon your retirement with the consent of the company, you may continue:
1. Life insurance in the amount of $2,500 plus 50% of that shown in Plan A provided you are enrolled in Plan A or B and have completed 15 years of continuous service, as of the date you retire.
2. Hospital expense and surgical expense insurances on yourself and your dependents. However, in a calendar year, hospital room and board benefits *951 will be limited to a maximum of $13 per day for a total of 60 days and reimbursement for additional charges will be limited to $300. Surgical expense benefits may not exceed $250 in a calendar year. These benefits apply to each insured member of a family separately. Any number of confinements or operations may make up these maximums.
Your monthly cost for insurance after retirement will be:
$1.00 for you, or
2.50 for you and one dependent, or
3.00 for you and more than one dependent
Plus 50¢ per month per $1,000 of life insurance in excess of $2,500.
(hereinafter "retirement provision").
22. The 1963 Plan booklet contained a retirement provision similar to the retirement provision in the 1961 Plan booklet except in paragraph (2): major medical expense insurance was included with a limit on such benefits "to a lifetime maximum of $2,500, without reinstatement;" the maximum for hospital and board benefits was increased from $13 per day for sixty days to $18 per day for seventy days, with a maximum reimbursement of $360 rather than $300 in additional charges; and the maximum in annual surgical expense benefits was increased from $250 to $300. The 1963 Plan booklet retirement provision also stated in paragraph 2, after setting forth the maximum benefits:
All other provisions will continue to apply. Your monthly cost for insurance after retirement is 50¢ for each $1,000 of life insurance in excess of $2,500.
23. In the 1966 Plan booklet, the introductory and first paragraphs of the retirement provision were the same as in the 1961 and 1963 Plan booklets. The remaining portion, however, read as follows:
2. Hospital expense, surgical expense and major medical expense insurances on yourself and your dependents. However, in a calendar year, hospital room and board benefits will be limited to the hospital's regular charge for semi-private accommodations for a total of 120 days and reimbursement for additional charges will be limited to $700. Surgical expense benefits may not exceed $450 in a calendar year. Major medical expense benefits will be limited to a lifetime maximum of $2,500 for all causes. These benefits apply to each insured member of a family separately. All other provisions will continue to apply.
Special Note: The expense insurances, described in the paragraph above, will be continued on individuals as long as they are ineligible for Medicare.
Your monthly cost for insurance after retirement is 50¢ for each $1,000 of life insurance in excess of $2,500.
24. The 1966, 1968, and 1970 Plan booklets provided for the coordination of benefits. In summary, the provision explained its purpose was to disallow payment of benefits beyond the amount of expenses incurred. Thus, payments made by another private group insurance plan or by a government benefit program reduced or eliminated the payments made under the Plan for the otherwise covered expenses.
25. As of July 1, 1966, Alpha established "The Alpha Post-65 Health Insurance Plan for Salaried Employees" ("Post-65 Plan"). The stated purpose of the Post-65 Plan was "to provide coverage for certain medical expenses which are not covered under either the Hospital or Supplementary Medical Insurance Plans offered under Medicare." All salaried employees, "active or retired," were eligible for the Post-65 Plan. This plan provided for coordination of benefits and reduced the amount of benefits actually paid by Alpha, although there was greater coverage to the employee, and did not specify a termination date or other indication of duration. Alpha terminated the Post-65 Plan in 1973.
26. The 1968 Plan booklet had the following retirement provision:
Upon your retirement after fifteen years of continuous service, you may continue:
1. Life insurance amounting to:
a. $2,500 if you are insured for the Minimum Amount only, or

*952 b. one-half of that shown in the Plan A total column on page 4, if you are enrolled in Plan A or Plan B just prior to retirement.
2. Hospital expense, surgical expense and major medical expense insurances on yourself and your dependents. However, in a calendar year, hospital room and board benefits will be limited to the hospital's regular charge for semi-private accommodations for a total of 120 days and reimbursement for additional charges will be limited to $700. Surgical expense benefits may not exceed $540 in a calendar year. Major medical expense benefits will be limited to a lifetime maximum of $2,500 for all causes. These benefits apply to each insured member of a family separately. All other provisions will continue to apply.
Special Note: The expense insurances, described in the paragraph above, will be continued on individuals as long as they are ineligible for Medicare.
Your monthly cost for insurance after retirement is 50¢ for each $1,000 of life insurance in excess of $2,500.
In the 1970 Plan booklet, the retirement provision was the same except for the deletion of the statement limiting to $700 the reimbursement for "additional charges" and the deletion of the statement that "[a]ll other provisions will continue to apply."
27. None of the booklets for the 1946 Plan, as amended through 1972, stated that the benefits would continue "for life" or "until death." None of the booklets after 1956 stated that the company reserved or had the right to amend, modify, or terminate the benefits provided to retired salaried employees.
28. In 1973, 1976, and 1978, Alpha distributed to its salaried employees a document entitled "Insurance and Health Program for Salaried Employees" or "Insurance and Health Program for Salaried Employees Plan Instrument" (hereinafter "Program Instrument").
29. Section 1.3 of the 1973 Program Instrument stated its provisions "supersede the provisions of the contract between an insurance carrier and the Company to the extent necessary to eliminate" any conflict between those provisions. However, Section 11.7 of the second to last section of this instrument states that "[e]xceptions, exclusions, and/or limitations not expressly herein provided with respect to any benefit provision shall be governed by the contract between [Alpha] and the insurance carrier to the extent permitted under § 1.3 of this Program."
The 1976 and 1978 Program Instruments stated:
In the event of any conflict between the provisions of this Program and the provisions of any contract between an Insurance Carrier and the Company, the provisions of said contract will supersede the provisions of the Program to the extent necessary to eliminate such conflict.
30. The 1973 Program Instrument stated that Alpha paid the cost of the program except Life and Salary Continuance Insurances. In the 1976 and 1978 instruments Alpha also excluded its payment of the cost of voluntary accidental death and dismemberment insurance.
31. Each of these Program Instruments stated that:
Commencing on and after the Effective Date, except as stated otherwise, the Company will provide for ... all Retirees, retired on or after the Effective Date, and their Dependents the Group Insurance Program set out herein. Insurance coverages under the Prior Programs not hereinafter provided shall be continued to the extent applicable to Retirees and their Dependents in accordance with the provisions of the Prior Programs as if fully set out herein and as the same may now or hereinafter be amended, modified or supplemented.
The benefits of the Prior Program for Employees, Retirees and Dependents thereof, shall be applicable for any occurrence for which benefits were provided under the Prior Program prior to the Effective Date of the Program subject to *953 all the provisions applicable to the Prior Program.
The 1976 and 1978 Program Instruments each contained a section explicitly setting forth the continuing benefits for retirees who retired "prior to January 1, 1976."
32. Except as expressly limited, to the extent "covered family member" was defined in each Program Instrument to include retirees and their dependent(s), the insurance coverage extended to retirees to the extent it provided coverage for a "covered family member." The Program Instruments expressly stated that accidental death and dismemberment insurance; sickness and accident (weekly indemnity) insurance; salary continuance insurance; basic diagnostic expense insurance; and dental expense insurance terminated upon retirement. The 1976 and 1978 Program Instruments also stated that the travel accident insurance and the voluntary accidental death and dismemberment insurance, both of which were first included in 1976, terminated upon retirement. In particular, the 1976 and 1978 Program Instruments stated that the voluntary accidental death and dismemberment insurance "terminates upon normal retirement at age 65. It may be converted upon early retirement."
33. With respect to retirees' life insurance benefits, the 1973 Program instrument provided:

 3.3 The amount of life insurance for
 each Retiree, who has completed 10 or
 more years of continuous service at the
 time of retirement and is retired on or
 after September 1, 1973, shall be:
 (a) $2,500 plus
 (b) an amount in accordance with
 the following table if he was insured
 for Additional Life Insurance just prior
 to retirement
 Additional Additional
 Life Insurance Life Insurance Retiree's
 Bracket Just Prior To After Monthly
 No. Retirement Retirement Cost
 1 $ None $ None $0
 2 5,500 3,000 .75
 3 13,000 4,000 1.25
 4 24,500 7,500 2.25
 5 37,000 8,750 2.75
 6 47,000 10,000 3.00
 7 57,000 and over 12,500 3.75
 3.4 Life Insurance coverage for each
 Retiree, retired before September 1,
 1973, shall continue in the same amount
 for which he was insured prior to
 September 1, 1973.
 * * *
 3.6(b) An employee shall have the same
 rights and benefits with respect to any
 portion of his life insurance terminated
 due to retirement on pension as though
 such portion of his life insurance
 terminated due to termination of
 employment.

*954 See also § 11.4 of the 1973 Program Instrument [life insurance for retirees on disability].
The 1976 and 1978 Program Instruments contained an identical provision except (a) the relevant retirement date was January 1, 1976, instead of September 1, 1973; and (b) each of the amounts in the second column from the left were reduced by $1,000. See also § 17.4 of the 1976 and 1978 Program Instruments [life insurance benefits for employees retiring on disability].
34. With regard to Basic Hospital-Surgical-Medical Insurance, the 1973 Program Instrument provided that:
[7.4] (b) The benefits described in subparagraph (3) of Section 7.1(a) [regarding recovery of benefits after 365 days of hospital confinement] and in Section 7.2(b) [regarding the amount paid for certain surgical procedures], which become effective on May 1, 1974, will be continued on Retirees:
(1) retired on and after May 1, 1974 and
(2) who have completed 10 or more years of continuous service.
and their Dependents.
and the 1976 and 1978 Program Instruments provided that:
The benefits described in Sections 11.1 [Basic Hospital Benefits] and 11.2 [Surgical Benefits] will be continued on Retirees:
(a) retired on and after January 1, 1976, and
(b) who have completed 10 or more years of continuous service and their Dependents.
35. For Major Medical Expense Insurance, each of the 1973, 1976, and 1978 Program Instruments provided:
Major Medical Expense coverage for Retirees and their dependents including disability retirees, who have 10 or more years of continuous service at the time of retirement and are retired on or after May 1, 1974 [or January 1, 1976, for the later two Program Instruments], shall be in the amount of $5,000. Major Medical coverage for those retired prior to the Effective Date shall continue in the same amount for which they were insured prior to the Effective Date. There shall be no reinstatement after retirement.
36. None of the 1973, 1976, or 1978 Program Instruments contains an express statement that retirees' benefits do or do not continue "for life" or "until death." The program instruments do state that "[t]he maximum lifetime [major medical expense insurance] benefit for an individual is [a specified amount] with respect to any one Covered Family Member's [defined as an employee, retiree or dependent thereof] lifetime." Section 9.2 of the 1973 Program Instrument; § 13.1 of the 1976 and 1978 Program Instruments. Under "Miscellaneous," the 1976 and 1978 Program instruments further provided:
Upon the death of an Employee or Retiree his Dependent coverage, except dental benefits, shall remain in effect for 30 calendar days after the date of his death.[[2]]
Section 17.5 of the 1976 and 1978 Program Instruments.
37. In November of 1977, Alpha sent to its salaried retirees a document captioned "Retirement Income Plan-Insurance and Health Program-Summary Plan Descriptions for Retired Salaried Employees." The first paragraph of that document stated in relevant part:
The amount of the benefits payable to you under the Retirement Income Plan and the details of your insurance continuance were explained to you when you retired. The pension payments you are currently receiving will continue in the same amount and for the period provided in the mode of settlement selected at retirement, and will not be changed. This also applies for your insurance continuance.
The document further specified:

Circumstances Which Could Result in Benefit Loss  Since you have completed *955 all of the plans' eligibility requirements for the benefits you are now receiving or are scheduled to receive  as explained to you when your retirement commenced  the only possible event in which you could lose your benefits or part of your benefits under the plans would be if the plans were terminated.
If the plans were ever to be terminated, the benefits to be provided thereafter would be limited to those which could be provided by the available assets of the retirement plan, as allocated in accordance with the requirements of the new law, and the retirement plan insurance. ... While Alpha hopes to be able to maintain the plans indefinitely, it must necessarily reserve the right to terminate the plans should business conditions ever warrant it.
This document was sent to approximately 102 salaried retirees, the number of salaried employees who had retired prior to January 1, 1978.
38. In the 1973, 1976, and 1978 Program Instruments, Alpha is disclosed as the Plan administrator. In the 1976 and 1978 Program Instruments, Alpha is also identified as the Plan fiduciary.
39. In early January 1978, Alpha distributed to its then active salaried employees, but not to its then retired salaried employees, an "Insurance and Health Program for Salaried Employees Summary Plan Description, effective January 1, 1976" (hereinafter "1976 Program SPD"). With respect to retirees' benefits, the 1976 Program SPD specifically explained:

 Retirement CoverageIf you retire with at least
 10 years of continuous service, you will be insured
 for $2,500 in basic life insurance. You may
 continue a portion of your additional life insurance
 coverage:
 Additional life
 insurance you
 If your additional life insurance may continue Monthly
 just prior to retirement was: after retirement cost
 $ 4,500 $ 3,000 $ .75
 $12,000 $ 4,000 $1.25
 $23,500 $ 7,500 $2.25
 $36,000 $ 8,750 $2.75
 $46,000 $10,000 $3.00
 $56,000 and over $12,500 $3.75
 Retirees also have the opportunity to convert both
 basic and additional coverage to individual
 insurance. You may convert up to the amount of
 your insurance, which ended when you retired, to
 an individual policy. You cannot convert to term
 insurance.
 * * *
 Retirement  If you retire with 10 or more years of
 service on or after January 1, 1976, you will
 continue to receive the Hospital/Surgical and Major
 Medical portion of plan coverage. Coverage will
 continue for the remainder of your life. However,
 the Major Medical lifetime maximum for retirees
 and their dependents is $5,000. This maximum
 cannot be reinstated. All other Health Expense
 coverages stop at retirement.

*956 (emphasis in original). This SPD also stated that accidental death and dismemberment insurance, voluntary accidental death and dismemberment insurance, travel accident insurance, and salary continuance insurance ended upon retirement, reaching "normal retirement age" or the "last day of active employment."
40. In July 1978, Alpha distributed to its then active salaried employees, but not to its then retired salaried employees, an "Insurance and Health Program for Salaried Employees Summary Plan Description, effective July 1, 1978" (hereinafter "1978 Program SPD"). This SPD stated it applied "to those actively employed or who retire on or after May 1, 1978." With respect to retirees' benefits, the 1978 Program SPD specifically explained:

 Retirement Coverage  If you retire with at least
 10 years of continuous service, you will be insured
 for $2,500 in basic life insurance. You may
 continue a portion of your additional life insurance
 coverage:
 Additional life
 insurance you
 If your additional life insurance may continue Monthly
 just prior to retirement was: after retirement cost
 $ 4,500 $ 3,000 $ .75
 $12,000 $ 4,000 $1.25
 $23,500 $ 7,500 $2.25
 $36,000 $ 8,750 $2.75
 $46,000 $10,000 $3.00
 $56,000 and over $12,500 $3.75
 Retirees also have the opportunity to convert both
 basic and additional coverage to individual
 insurance. You may convert up to the amount of
 your insurance, which ended when you retired, to
 an individual policy. You cannot convert to term
 insurance.
 * * *
 Retirement  If you retire with 10 or more years of
 service on or after January 1, 1976, you will
 continue to receive the Hospital/Surgical and Major
 Medical portions of plan coverage. Coverage will
 continue for the remainder of your life. However,
 the Major Medical lifetime maximum for retirees
 and their dependents is $5,000. This maximum
 cannot be reinstated. All other Health Expense
 coverages stop at retirement.
 At age 65 you and your spouse are eligible for
 Social Security's Medicare Program. The benefits
 under Medicare plus the benefits described above
 generally bring the total amount of your benefit
 up to the amount normally covered by this Health
 Expense Plan . . . sometimes more.

The 1978 Program SPD further stated that accidental death and dismemberment insurance, voluntary accidental death and dismemberment insurance, travel accident insurance, short term accident and sickness (weekly indemnity) insurance, and salary *957 continuance insurance ended upon retirement, reaching "normal retirement age" or the "last day of active employment."
41. Both the 1976 and the 1978 Program SPDs explained they were summary descriptions of the respective programs, and that salaried employees should consult the Program Instruments received from Alpha if the employees needed more specific information. Both of these SPDs also noted (a) contributions to the programs were "made by Alpha and its active and retired salaried employees;" and (b) the relevant benefits are funded through contracts with Equitable. Finally, each of these SPDs stated:

Plan Continuation  The Company expects and intends to continue this plan indefinitely but reserves the right to end or amend it. If the plan is terminated by the Company, benefits will be paid for bills incurred prior to the termination date of the plan and for individuals whose coverage would continue due to disability.
42. Alpha's personnel manager routinely sent a form letter describing retirement benefits to salaried employees who were about to retire. Copies of these letters contained in the record show that in discussing potential surviving spouse pension benefits, the letter set forth the amount of monthly payment the surviving spouse would receive "for the remainder of her life." In discussing continuing insurance benefits, the letter usually stated that life insurance and hospital and surgical coverages "will continue" or "will be continued," and that
[m]ajor medical expense benefits will be provided up [or limited] to a lifetime maximum of [a specified amount]. These maximums [or benefits] apply to you and your eligible dependents [or wife] separately.
A form of this letter was sent to a retiring salaried employee as late as January 20, 1982.
43. By deposition, several salaried employees, less than ten percent of the plaintiff class, testified they had understood from oral representations made by Alpha officials that the insurance benefits continued for a lifetime. The deponents did not clearly recall the circumstances of such representations and several noted they looked to the language within the instruments and SPDs Alpha provided to them to learn of the available insurance benefits.
44. There is credible trial and deposition testimony that in late 1981, Mr. Bonstein, the person responsible for administering Alpha's employee benefits, informed salaried employees at two cement plants scheduled for closing that their insurance benefits would continue "as long as there was an Alpha." During these meetings, salaried employees were advised by Alpha officials to look for alternatives to Alpha's insurance benefits.
45. Mr. Bonstein testified during trial that he did not promise to any salaried employee or retiree that insurance benefits would continue for life or until death.
Brooks Edwards, a former Alpha vice-president, testified by deposition that he had understood the lifetime continuation of insurance benefits for Alpha's retired salaried employees was a company policy. The Court does not give such deposition testimony great weight. Mr. Edwards' testimony of the basis for this understanding was not detailed and was based on communications from Mr. Bonstein and the company's written materials. Without more, the Court is not willing to discredit Mr. Bonstein's trial testimony as to company policy and representations regarding retired salaried employees' insurance benefits.
46. On March 2, 1982, Alpha sent each salaried retiree a letter stating in relevant part:
This is to notify you that effective May 1, 1982, Alpha is cancelling group insurance coverage on all retired salaried employees and their dependents....
We recognize this action will create a serious financial hardship for many of you, but the cost of this program has grown to such proportions in relation to Alpha's now limited cement operations, *958 that we have no alternative. In 1981 Alpha Cement shut down or sold four of its six plants and we are currently negotiating for the sale of the two remaining  Catskill, New York and Lime Kiln, Maryland.
The closings and sales swelled the ranks of retirees and at present there are two retirees for each active employee. Alpha expects to be out of the cement business some time soon and rather than have the insurance program end abruptly and without notice, we have selected May 1, 1982 as the termination date, which allows you ample time to secure alternate coverage. The May 1 termination date coincides with a proposal we have made to the Cement, Lime, Gypsum and Allied Workers International Union in which we requested that they eliminate those provisions of our contract which require the Company to provide medical and life insurance to members of their union who are now retired.
Our insurance carrier, The Equitable Life Assurance Society, has agreed to permit you to convert your health and life insurance coverage to an individual policy.
47. As of May 1, 1982, Alpha terminated its group insurance coverage for retired salaried employees.
48. During the 1970s and into 1981, Alpha's cement division incurred large operating losses and Alpha failed to comply with certain covenants and interest payment requirements of its loan agreements. To meet its cement division's financial obligations, Alpha unsuccessfully tried to sell Slattery, and used Alpha's cement assets and cash from Slattery.
49. In 1981 and 1982, Equitable paid Alpha dividends or retroactive rate refunds of $51,722 and $33,299 on its group life policies. The group policies provided that any surplus shall be paid to Alpha or, upon Alpha's written request, may be applied against premiums. Equitable group insurance contract manager, Frank Cartelli, testified that refunds on group policies are paid only to the policyholder, not to individual insureds, and that Equitable had no mechanism for allocating refunds between the employer and the insureds. The policy makes no provision for allocating any part of the refunds to individual insureds, and plaintiffs have not suggested any means by which Equitable could have done so.
50. David Glueck, a consultant to employers on the subject of employee benefits, who specializes in the non-pension or welfare benefit area, testified on behalf of defendant Alpha and without objection by plaintiffs as to his status as an expert in his field. Mr. Glueck noted that as a matter of accounting practice, most employers reflect in their financial statements the present actuarial value of anticipated future pension payments but virtually none do so for future welfare benefit costs. This difference is based in part on conceptual differences between pension and welfare liabilities (i.e., the costs of life, health, and medical insurance programs). Pension liabilities are based on age, earnings, length of service, and other known objective factors. They are earned, accrued, and ascertainable. Welfare liabilities, on the other hand, are unpredictable and unknown since they are dependent on the costs of care, catastrophic illnesses, and other uncontrollable factors. Moreover, welfare benefits are not earned and accrued since they are fully available to everyone, regardless of salary and years of service. Welfare benefits are thus almost universally administered on a "pay as you go" basis.
There is need for greater flexibility in welfare benefit plans. Unlike pension plans, welfare plans are subject to constant modifications for reasons of cost containment and rapid technological and health care changes. Due to factors such as the rapid rise in medical costs, declining Medicare payments, the advent of health maintenance organizations, mandatory out-patient treatment, and second opinions, employers must have the flexibility to change carriers, coverage, and benefits. For these same reasons, employers need the ability to *959 modify or eliminate post-employment coverage.
Finally, many employers provide no group life insurance at all after retirement. There are two apparent reasons: first, because a greater proportion of retirees than active employees die each year and because all retirees eventually die, post-retirement group life insurance is more expensive than pre-retirement group life; and second, since the primary purpose of life insurance is generally to replace the loss of the worker's wages, the need for life insurance disappears or greatly declines after retirement. Life insurance coverage purchased for retirees is generally term insurance that has no built-up value.

Conclusions of Law
A. This Court has jurisdiction over this matter pursuant to 29 U.S.C. § 1132(f).
B. Plaintiffs and the class they represent were participants and beneficiaries, as defined in 29 U.S.C. §§ 1002(7) and 1002(8), of the Alpha Insurance and Health Program for Salaried Employees, an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1).
C. If the retirees' life and health insurance are vested benefits, then the benefits may not be terminated without the retirees' consent. See, e.g., Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 398-99 n. 20, 30 L.Ed.2d 341 (1971).
D. Here, there is no contention that ERISA imposes on employee welfare benefit plans the stringent vesting, participation, and funding requirements imposed on pension plans. See 29 U.S.C. § 1051(1) and 29 U.S.C. § 1081(a)(1). Instead, the parties' positions focus on the available documentation of the insurance plan(s) and the parties' conduct related thereto.
E. Interested parties may provide for either the vesting or the termination of retired employees' welfare benefits. Cf. Hansen v. White Motor Corp., 788 F.2d 1186 (6th Cir.1986) (parties may set out by agreement or by private design whether non-union salaried retirees' welfare benefits vest or may be terminated).
F. Thus, the issue is one of contract interpretation, District 29 United Mine Workers of America v. Royal Coal Co., 768 F.2d 588, 590 (4th Cir.1985), and, if necessary, a consideration of the relevant extrinsic evidence and the parties' course of dealing, Food & Commercial Workers Local 150A v. Dubuque Packing Co., 756 F.2d 66, 69, 70 (8th Cir.1985). See International Union, UAW v. Yard-Man, Inc., 716 F.2d 1476, 1479-80 (6th Cir.1983), cert. denied, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).
G. Plaintiffs have the burden "to show that the parties intended retirees' benefits would be vested and not tied to the agreement which created them." Dubuque Packing Co., supra, 756 F.2d at 70.
H. Plaintiffs contend that the Plan documentation provided and communications to salaried retirees and salaried employees clearly provide salaried retirees' lifetime insurance benefits, without the possibility of cancellation by defendant. In particular, plaintiffs note the documentation contains no language limiting the duration of the benefits to any period less than the salaried retirees' lifetimes. Plaintiffs also contend any reserved right to amend applied to active employees only and not to retirees. Plaintiffs urge that their reasonable expectations of such benefits should be enforced and that the ambiguous language in the documents drafted by Alpha should be construed in plaintiffs' favor. In response to Alpha's contention that there was, without objection, an earlier reduction of retirees' benefits, based on the coordination of benefits provisions, including the Post-65 Plan, plaintiffs argue the change was merely an administrative refinement of the program and not a reduction in benefits received by retirees. Plaintiffs note that "[t]he Court needs [sic] not resolve the issue as to what standard applies to Alpha's conduct in terminating plaintiffs' retirement insurance benefits. [The Court may assume] for the sake of argument, *960 that Alpha argues correctly for an `arbitrary and capricious' standard." Plaintiffs contend that under the circumstances here, Alpha's conduct was arbitrary and capricious and violated the requirements of ERISA.
Defendant Alpha argues that the relevant program documents unambiguously reflect Alpha's right to decrease or eliminate retiree coverage. Specifically, Alpha notes (a) the 1976 and 1978 instruments explicitly reaffirmed benefits to prior retirees, a statement that would be unnecessary if prior benefits were vested; (b) the right to amend the benefits was expressly set forth in the Plan booklets, certificates, and SPDs distributed to class members, and aws done without objection when the coordination of benefits provisions were added; and (c) that the inconsistent provisions must be construed to render them harmonious. Alpha argues that if it had intended to extend coverage throughout the salaried retiree's lifetime, the "for the remainder of your life" language would have appeared in statements regarding both life and health insurance coverage, rather than in statements regarding only health insurance benefits. Finally, Alpha contends plaintiffs may not recover on the basis of the SPDs' language to the extent that language differs from language in the Plan instrument.
I. The language of the 1973, 1976, and 1978 Program Instruments reflected an effort to limit coverage for salaried retirees covered by those instruments to a period subject to modification or termination. These instruments specifically reaffirmed benefits of past retirees and earlier plans stating that benefits previously provided would "continue" or "be continued." Moreover, the 1976 and 1978 instruments each contained an article specifying the prior benefits that continued. The clear inclusion of provisions reiterating the continuation of prior benefits and earlier plan coverage persuades the Court that Dubuque Packing Co., supra, does not require a finding for plaintiffs. In that case, the Eighth Circuit determined that the parties intended retiree benefits to continue beyond a collective agreement's term. In particular, the Eighth Circuit found that, unlike prior agreements, the most recent agreement did not contain provisions extending benefits to employees who retired before the agreement's effective date and there was no explanation for the omission. Dubuque Packing Co., supra, 756 F.2d at 69. The agreement in Dubuque Packing Co. is thus factually distinguishable from the instruments here that contain language expressly continuing earlier coverage for retirees.
Furthermore, the instruments, rather than providing that retiree benefits are fixed forever, provided for continuation of "[i]nsurance coverages under the Prior Programs ... as the same may now or hereafter be amended, modified or supplemented." This provision for modification is not consistent with a conclusion that the benefits would continue without the possibility of change or termination. See Struble v. New Jersey Brewery Employees' Welfare Trust Fund, 732 F.2d 325, 330-31 (3d Cir.1984) (affirming summary judgment in favor of defendants who terminated retired employees' welfare plan benefits based on a collective bargaining agreement including language expressly permitting amendment and containing no language suggesting benefits would be provided beyond the term of the agreement).
J. While the earliest Plan documents contained language expressly reserving to Alpha the right to amend or terminate the Plan's coverage, such language was not in the materials distributed to covered employees between 1956 and 1973.[3]
*961 The November 1977 letter sent to then retired salaried employees referred to the possibility of Plan termination and explicitly reserves to Alpha the right to terminate the plans "should business conditions ever warrant it." Moreover, the 1976 and 1978 Program SPDs clearly set forth Alpha's reservation "to end or amend" the plan. The record reveals no response or objection to these notices by then retired salaried employees. Thus, the record reflects that by March 1, 1982, Alpha had provided to each retired salaried employee written statements, in Plan Instruments or Plan SPDs, of Alpha's intent to amend or terminate the coverage provided by the plans.
K. The Court is troubled by language in the 1976 and 1978 Program Instruments and in the 1976 and 1978 SPDs that implies insurance benefits would be provided throughout a retiree's lifetime, in particular § 17.5 of the Instruments and the SPDs' "retirement" provision pertaining to Hospital/Surgical and Major Medical "[c]overage [which] will continue for the remainder of your life."[4] While neither party has directed the Court's attention to § 17.5 of the 1976 and 1978 instruments, both sides note the SPD language. The Court finds such language is ambiguous (cf. § 17.5 of the 1976 and 1978 Program Instruments) in conveying the duration of program benefits.
Plaintiffs' argument that ambiguous language in a contract falling under ERISA's provisions should be construed against the drafter of the contract is not persuasive. The Court finds instead that the judgment of the plan administrator prevails so long as it is not arbitrary and capricious. Quinn v. Burlington Northern, Inc. Pension Plan, 664 F.2d 675, 676 (8th Cir.1981), cert. denied, 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982); Bruch v. Firestone Tire & Rubber Co., 640 F.Supp. 519, 524 and 524 n. 3 (E.D. Pa. 1986). Moreover, inconsistent provisions, such as those permitting modification of the program and those intimating benefits last for life, must be construed so as to be harmonious. International Union v. Yard-Man, Inc., supra, 716 F.2d at 1479-80. The Court finds harmonious and reasonable Alpha's interpretation of the written documents to provide lifetime benefits subject to Alpha's continuation of the relevant insurance programs and to Alpha's reserved right to amend or end the coverage. Thus, the Court finds Alpha is not liable to plaintiffs for the May 1, 1982, termination of benefits. The Court is persuaded not only by the languge of amendment in the relevant documentation, but by the lack of plaintiffs' vociferous objections to or timely efforts to alter the company's proposals for coordination of benefits, including the Post-65 Plan, and the company's pre-plant closing suggestions that salaried employees look for alternatives to their Alpha insurance coverage.
L. Plaintiffs have presented no evidence that Equitable is or was an ERISA fiduciary with respect to any of the matters that pertain to plaintiffs' claims. ERISA defines a fiduciary as one who exercises discretion over the management of plan assets, renders investment advice for a fee, or exercises discretionary control over the administration of a plan. 29 U.S.C. § 1002(21)(A). Equitable paid health care benefits pursuant to an administration agreement with Alpha. By the terms of this agreement, Alpha had sole authority to determine the retirees' eligibility and final authority to determine the amount of benefits *962 payable. The group life insurance policies issued to Alpha required Equitable to refund to Alpha any dividends or other refunds and Equitable did so. Equitable is not holding any plan assets, nor does it have any role in the administration of any Alpha benefit program to which the plaintiff class claims an interest. Equitable's payment of health care claims pursuant to the provisions of the Plan from funds provided periodically by Alpha under the administration agreement does not clothe Equitable with discretionary authority over management of plan assets or over the administration of the plan to such an extent that Equitable's role was that of a fiduciary. Austin v. General American Life Insurance Co., 498 F.Supp. 844, 846 (N.D.Ala.1980) (no claim under ERISA against mere insurer); cf. Chicago Bd. of Options Exchange, Inc. v. Connecticut General Life Insurance Co., 713 F.2d 254, 259 (7th Cir.1983) (liability to amend annuity contract may render insurance company a fiduciary). Furthermore, no one contends, nor is there evidence to suggest, that Equitable had any role, discretionary or otherwise, in Alpha's decision to terminate the plan.
Accordingly, judgment will be entered in favor of defendants and against plaintiffs.
NOTES
[1] By order dated February 20, 1985, and upon plaintiffs' request, the Court, in relevant part, dismissed plaintiffs' claims in all counts except Count I. Furthermore, the Court does not now have before it the plaintiff-intervenor United States' claim. The Court bifurcated that claim for later, separate consideration, if necessary.
[2] In the 1973 Program Instrument, a similar provision was expressly limited to the "death of an active employee." "Miscellaneous," Section 11.6 of the 1973 Program Instrument.
[3] Defendant Alpha urges that the certificates of insurance provided to each salaried employee contained language of amendment or termination. The Court does not, however, make or rely on such a finding because the record does not contain a copy of the certificate(s) issued for each Plan. Since the exact language used in documents is significant, the Court will not rely on a few certificates as being identical to those issued throughout the course of an almost forty-year history of insurance coverage and amendments.
[4] To the extent plaintiffs seek to infer a promise of lifetime benefits from the words "will continue" in certain documents, the Court declines to adopt plaintiffs' position in view of the language in the relevant plan instruments. See Upholsterers' Int'l Union v. American Pad & Textile Co., 372 F.2d 427, 428 (6th Cir.1967) (pre-ERISA case; "continue" is an ambiguous word and should be read in light of the whole document); International Union v. Roblin Indus., Inc., 561 F.Supp. 288, 298 (W.D.Mich.1983) (court looked to whole document properly to construe meaning of "continue"); see also United Rubber, Cork, etc., Workers v. Lee Nat'l Corp., 323 F.Supp. 1181, 1188 (S.D.N.Y.1971) (pre-ERISA; even if deemed ambiguous, plaintiff may not merely deny defendant's position on interpretation of "continue" but must provide evidence to support the contrary position).