**Donald ARMBRUSTER, et al., Plaintiffs,**

v.

**K–H CORPORATION, Defendant.**

**No. 97–CV–75792-DT.**

United States District Court, E.D. Michigan, Southern Division.

June 17, 2002.

Charles Gottlieb, Esq., Bingham Farms, MI, for Plaintiffs.

Scott A. MacGriff, Esq., Francis R. Ortiz, Esq., Detroit, MI, for Defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

## I. INTRODUCTION

■ The above-captioned ERISA action is presently before the Court on Defendant K–H Corporation's Motion for Summary Judgment.[1] Plaintiffs have responded to Defendant's Motion to which response Defendant has replied. Supplemental briefs have also been filed by both parties. Having reviewed and considered the parties' briefs and supporting documents and the Court's entire record of this matter, the Court has determined that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided "on

---

1. There is also currently pending Plaintiffs' Motion for Class Certification. However, the Sixth Circuit has held that a district court is not required to determine whether a complaint could be properly maintained as a class action before ruling on the merits of the case. *See Jibson v. Michigan Educ. Association–NEA,* 30 F.3d 723, 734 (6th Cir.1994); *Marx v. Centran Corp.,* 747 F.2d 1536, 1552 (6th Cir.1984) *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985). *See also,* *Wright v. Schock,* 742 F.2d 541, 544 (9th Cir.1984) ("It is reasonable for a district court to consider a motion for summary judgment before reaching a motion for class certification when resolution of the former is likely to prevent 'needless and costly further litigation.'") Therefore, the Court has decided to address the pending motion for summary judgment in this case before ruling on Plaintiffs' motion for class certification.

the briefs." This Opinion and Order sets forth the Court's ruling.

## II. *PROCEDURAL AND FACTUAL BACKGROUND*

### A. *THE PARTIES*

Plaintiffs Donald Armbruster, John Gustke, Robert Rawlings, William Varney, Robert Butler, Maynard Brandt and Harold Messacar are former salaried employees of the Fruehauf Corporation, the predecessor-in-interest of Defendant K–H Corporation. All seven of the named Plaintiffs retired from Fruehauf before July 14, 1989. Plaintiffs Armbruster, Gustke, Rawlings, Varney and Butler retired under Special Early Retirement Plans offered by Fruehauf in 1982, 1987 and 1988.[2] Plaintiffs Brandt and Messacar retired under the company's standard retirement plan in October 1981 and February 1985, respectively.

Defendant K–H Corporation is the successor-in-interest of the business entity formerly known as Fruehauf Corporation.[3] Fruehauf was, at one time, one of the world's largest manufacturers of truck trailers and shipping containers. Plaintiffs worked in Fruehauf's trailer operations. On July 14, 1989, Fruehauf sold its trailer operations, along with its maritime operations, to a subsidiary of Terex Corporation known as FRH Acquisition Corporation ("FRH"), pursuant to a purchase agreement dated as of March 27, 1989. FRH subsequently changed its name to "Terex Trailer Corporation" and was later renamed "Fruehauf Trailer Corporation." As required by the terms of the purchase agreement, the former Fruehauf Corporation, now divested of its trailer and maritime businesses, changed its corporate name to "K–H Corporation." The change of corporate name occurred on August 4, 1989.

Although Plaintiffs had retired from the old Fruehauf Corporation prior to July 14, 1989, the date of the sale of the company's trailer operations to the Terex subsidiary now known as Fruehauf Trailer Corporation, pursuant to the terms of the March 27, 1989 purchase agreement, the new Fruehauf Trailer Corporation assumed "all debts, liabilities, and obligations" of old Fruehauf [now known as K–H Corporation], including all liabilities to former employees of the transferred Fruehauf trailer and maritime businesses under Fruehauf's employee benefit and pension plans. *See* Defendant's Ex. A.[4]

---

**2.** Plaintiff Gustke retired under the early retirement plan offered in August 1982; Plaintiff Rawlings retired under the early retirement plan offered in September 1987; and Plaintiffs Armbruster, Varney and Butler retired under the early retirement plan offered in October 1988.

**3.** K–H Corporation is a holding company with no operations; substantially all of its assets are the capital stock of Kelsey–Hayes Corporation and substantially all of its revenues are generated by Kelsey–Hayes and its subsidiaries.

**4.** The Assumption Agreement provided in pertinent part as follows:

[I]n consideration of the execution by the Seller of the [Purchase] Agreement and the execution by the Seller of the Bill of Sale and for other good and valuable consideration receipt of which is hereby acknowledged the Purchaser [Terex Trailer Corporation, now known as Fruehauf Trailer Corporation] by these presents does assume and agree to pay, perform and discharge, and to defend and indemnify and hold harmless from, any and all debts, liabilities and obligations, whether fixed or contingent, or mature or unmatured, including without limitation... those arising under any contract, commitment or undertaking of the Seller, on or prior to the date hereof...

\* \* \* \* \* \*

(ii) owing or relating to... any and all Liabilities of the Seller to Former Employ-

## B. *MEDICAL INSURANCE COVERAGE PROVIDED TO FRUEHAUF RETIREES*

Beginning in 1979 through the closing of the sale of the trailer business, the cost of retiree medical insurance for salaried retirees had been borne entirely by Fruehauf Corporation. Not long after the sale of the trailer and maritime businesses, salaried retirees of the former Fruehauf Corporation were advised in writing by the new Fruehauf Trailer Corporation that effective January 1, 1990, each retiree would be required to contribute to the cost of his or her retiree medical coverage, and were advised of their required annual contribution amount. *See* Defendant's Ex. B and B1 through B4.[5] Then, in April 1994, Fruehauf Trailer announced that effective June 1, 1994 medical coverage for retirees and spouses of retirees age 65 or older would only be offered through a "Medi–Gap" medical insurance program offered as part of the American Association of Retired Persons ("AARP") Group Health Insurance Program. *See* Defendant's Ex. B5. Retirees and spouses under age 65 continued to be covered under the Fruehauf program until they reached age 65. *Id.*

Under both the AARP and the Fruehauf program for under 65–year–old dependents, retirees remained responsible for paying a portion of their medical coverage. *Id.*

On June 15, 1994, Plaintiffs instituted an action against Fruehauf Trailer Corporation challenging the company's decision effective January 1, 1990 requiring them to pay a portion of their medical insurance costs. *See Fuller, et al. v. Fruehauf Trailer Corp.,* 94–CV–72333–DT. (the "*Fuller* action").[6] All of the Plaintiffs in the instant action were also Plaintiffs in the *Fuller* action.[7] The Plaintiffs alleged the very same claims in the *Fuller* action that they allege now in the instant action.

In *Fuller,* the Plaintiffs sued Fruehauf Trailer Corporation, i.e., the company that assumed the liabilities of their former employer, alleging that they had been promised fully-paid health care benefits "for life," and that by failing to continue to provide post-retirement medical benefits at company expense after January 1, 1990, Fruehauf Trailer violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* and the Racketeer Influenced and Corrupt Or-

---

ees of the Transferred Businesses, including, without limitation, all Liabilities to such former employees under any employee benefit plan of the Seller (including all Liabilities under the Assumed Severance Agreements and all Liabilities and benefits payable to Transferred Employees and Former Employees under the employee related plans and arrangements set forth on Schedule A hereto). . . .

*See* Assumption Agreement, Defendant's Ex. A.

5. The structure of Fruehauf's cost-sharing program in 1990, 1991, 1992, and 1993 was that in each year the company paid the increase in the health care costs up to the rate of increase based upon the Cost of Living Adjustment for Social Security Benefits as

determined by the Department of Labor in the third quarter of each year (COLA) and the retiree being responsible for any additional amount by which medical claims costs exceeded Social Security COLA. *See* Defendant's Ex. B1–B4.

6. All of the Plaintiffs in the instant action were plaintiffs in the 1994 action. One other individual, Earl Fuller, was also named as a party-plaintiff in the 1994 action. Mr. Fuller is the only named plaintiff in the 1994 action who is not also a named party in this case.

7. Earl Fuller, the first named plaintiff in the 1994 action, is the only plaintiff in the prior action who is not a party-plaintiff in the present action.

ganizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*

In September 1996, this Court certified the action as class action, the class being "all persons who as of July 14, 1989 were participants or beneficiaries of Defendant's medical plan for salaried employees and who retired between January 1, 1979 and October 31, 1989," dividing this class into two sub-classes: (1) those persons who retired under one of the Special Early Retirement Programs between 1982 and 1988 and (2) those persons who retired pursuant to a standard retirement. *See Fuller v. Fruehauf Trailer Corp.,* 168 F.R.D. 588, 605 (E.D.Mich.1996).[8]

Less than a month after the Court issued its class certification decision, on October 7, 1996, Fruehauf Trailer Corporation filed for Chapter 11 bankruptcy. As a consequence, the *Fuller* case was automatically stayed, and then on December 20, 1996, the case was administratively closed.

The Fruehauf Trailer bankruptcy proceedings revealed that the company would not emerge from Chapter 11 and would be liquidated. Fruehauf Trailer advised re-

tirees in the spring of 1997 that it would cease providing them with medical insurance coverage effective April 15, 1997. *See* Defendant's Ex. E. (The bankruptcy was closed on April 15, 1997.) However, on May 27, 1997, K–H Corporation sent letters to Fruehauf retirees, advising them that K–H was "the successor to FTC" and would continue to provide them with medical insurance coverage "on the same terms and conditions that FTC provided coverage on April 15, 1997." *See* Defendant's Ex. F.[9]

The Plaintiffs were not satisfied with being provided with medical insurance coverage on the same terms and conditions that Fruehauf Trailer had provided them coverage, i.e., on a shared-cost basis. Therefore, on November 21, 1997, Plaintiffs filed the instant action alleging the very same ERISA and RICO claims they alleged in the pre-bankruptcy lawsuit challenging the decision to require retirees pay for a portion of the cost of medical insurance coverage, only this time they asserted these claims against K–H Corporation.[10]

**8.** The Court's decision granting class certification in *Fuller* was decided prior to the Sixth Circuit's *en banc* decision reversing the district court's grant of the plaintiffs' motion for class certification in *Sprague v. General Motors,* 133 F.3d 388 (6th Cir.1998) (en banc). This Court's *Fuller* decision was based in large part on the district court's decision in *Sprague* which, at the time of this Court's ruling had just been affirmed by a three-judge panel of the appellate court. *See Fuller,* 168 F.R.D. at 596–597 & n. 14, citing *Sprague v. General Motors,* 843 F.Supp. 266 (E.D.Mich. 1994), *aff'd,* 92 F.3d 1425 (6th Cir.1996). The three-judge panel's affirmance was subsequently *vacated* on rehearing en banc, 102 F.3d 204 (6th Cir.1996), and ultimately *reversed* in relevant part, in the appellate court's *en banc* decision. 133 F.3d 388.

**9.** Although it was in bankruptcy, Fruehauf Trailer had continued to provide retirees with medical insurance coverage. In January

1997, however, Fruehauf Trailer requested K–H Corporation to assist with the payment of salaried retiree medical benefits. K–H agreed to do so on an interim basis, i.e., from January 15, 1997 through April 15, 1997, while it gathered information and determined whether to allow the Bankruptcy Trustee to terminate retiree medical benefits. *See* Defendant's Ex. G. Ultimately, K–H decided not to terminate the salaried retiree medical benefits and agreed to assume prospective responsibility for existing benefit levels beginning April 16, 1997. *See* Defendant's Ex. H.

**10.** The Plaintiffs had filed individual and class proofs of claim in the bankruptcy court, but they decided to proceed with this action against K–H because the bankrupt Fruehauf Trailer did not have "assets available to pay such claims and apparently no relief [would] be forthcoming from the bankruptcy." *See* Complaint, ¶ 8.

## 1. THE FRUEHAUF RETIRED SALA-RIED EMPLOYEES MEDICAL IN-SURANCE PLAN

The Fruehauf Corporation medical insurance plan at issue in this case is part of a Group Insurance Plan for life insurance, accidental death and dismemberment insurance, and medical and dental benefits provided to Fruehauf salaried employees and retirees through a policy issued by Connecticut General Life Insurance Company. During the 1979–1989 time period of relevance to this action, Fruehauf issued several booklets summarizing the Plan (referred to herein as "plan descriptions," "summary plan descriptions" or "SPDs"). Pertinent portions of seven such SPDs have been submitted by the parties here for the Court's consideration.

Two of the plan descriptions, i.e., the SPDs issued in 1979 and in 1986, expressly state that they describe Fruehauf Corporation's "Group Insurance Plan for Salaried Retired Employees." The other plan descriptions, i.e., those issued in 1981, 1983, 1984, 1985, and 1987 are not expressly limited to retirees. These are captioned as Fruehauf Corporation's "Group Insurance Plan for Salaried Employees." However, each of the SPDs that are not specifically designated as summary descriptions of salaried *retirees'* plans contain specific provisions which state that medical insurance coverage provided under the Salaried Employees' Group Insurance Plan to salaried employees will be continued for any salaried employee (and the employee's eligible dependents) if he or she retires from active service under the Salaried Retirement Plan on or after January 1, 1979. [*See e.g.,* Plaintiffs' Ex. 29, 1981 Group Insurance Plan booklet, p. 41.]

The SPD issued in January 1979 provided in pertinent part as follows:

Any permanent full-time Salaried Employee . . . who is covered under the Sal-aried Retirement Plan on or after June 1, 1976 will be eligible for the insurance on his retirement date.

\* . \* \* \* \* \*

The insurance will be continued for a surviving spouse, but coverage will terminate if that spouse remarries.

\* \* \* \* \* \*

The insurance on the surviving spouse of a deceased Retired Employee will be continued without cost until the surviving spouse remarries.

\* \* \* \* \* \*

The cost of the plan is paid by the company.

[*See* Plaintiffs' Ex. 28]

The 1981 summary plan description provided:

If you retire from Active Service under the Salaried Retirement Plan on or after January 1, 1979, your Medical Insurance will be continued for you and your eligible dependents.

In addition, Medical Insurance will be continued for your surviving spouse if you are an insured retiree who retires from Active Service on or after January 1, 1979, or if your spouse is the recipient of a Pre–Retirement Death Benefit and your death occurs while in Active Service on or after January 1, 1979. This coverage includes eligible dependents and will continue for life unless your surviving spouse remarries . . . .

[*See* Plaintiff's Ex. 29]

The SPD issued in 1983 provided:

If you retire from Active Service while your insurance is still in effect and [you retire] on or after January 1, 1979 under the Salaried Retirement Plan, your Medical Insurance will continue for the rest of your life. Insurance for your dependents will also continue as long as

they remain eligible. The company pays the full costs of this insurance.

\* \* \* \* \* \*

This coverage [for your spouse] will continue for the rest of your surviving spouse's lifetime—unless he or she remarries.

[*See* Defendant's Ex. 3.]

The 1984 plan description stated as follows:

If you retire from Active Service while your insurance is still in effect and on or after January 1, 1979 under the Salaried Retirement Plan, your Medical Insurance will continue for the rest of your life. Insurance for your dependents will also continue as long as they remain eligible. The company pays the full cost of this insurance.

Medical insurance will be continued for you surviving spouse... for the rest of your surviving spouse's lifetime—unless he or she remarries....

[*See* Plaintiffs' Ex. 32.]

The 1985 SPD provided:

If you retire from Active Service while your insurance is still in effect and on or after January 1, 1979 under the Salaried Retirement Plan, your Medical Insurance will continue pursuant to the terms of the plan. Insurance for your dependents will also continue as long as they remain eligible. The company pays the full costs of this insurance.

\* \* \* \* \* \*

The [Surviving Spouse] coverage will continue pursuant to the terms of the plan—unless he or she remarries.

[*See* Plaintiffs' Ex. 34.]

The 1986 Retired Salaried Medical Plan summary plan document provided:

You're eligible to become a member of the Group Insurance Plan if:

• you are a salaried retiree.

• you retire under the Salaried Retirement Plan while your insurance is still in effect.

Your Group Insurance starts on the day you retire.

Your eligible dependents automatically become insured for Medical benefits on the same day you do.

\* \* \* \* \* \*

In general, your Group Insurance ends on the date:

• you are no longer eligible for membership in the Plan; or

• the date the Group Insurance policy terminates.

\* \* \* \* \* \*

The insurance on a Surviving Spouse of a deceased Retired Employee will be continued pursuant to the terms of the Plan.

[*See* Plaintiffs' Ex. 36.]

The SPD issued in 1987 provided, in pertinent part:

If you retire from Active Service and your insurance is still in effect and on or after January 1, 1979 under the Salaried Retirement Plan, your Medical Insurance will continue pursuant to the terms of the plan. Insurance for your dependents will also continue as long as they remain eligible. The company pays the full cost of this insurance.

Medical Insurance will be continued for you r surviving spouse and his or her eligible dependents... unless he or she remarries....

*See* Plaintiffs' Ex. 35.

Plaintiffs rely upon these various provisions in the summary booklets in support of their claims that as Fruehauf retirees, they are entitled to company-paid medical insurance coverage for life.

However, each of the various plan summaries issued by Fruehauf during the 1979–89 time period—including the above-quoted SPDS—also contained explicit language reserving Fruehauf's right to modify or terminate the Plan at any time. For example, the 1979 and 1981 SPDs stated, "The Plan Administrator may change or eliminate benefits under the plan and may terminate the entire plan or any portion of it. . . ." The 1983 summary plan description provided, "The Company intends to continue the Plan indefinitely. However, the Company reserves the right to change the Plan, and if necessary, to discontinue it." The 1985, 1986 and 1987 summaries stated, "The Company has the right to change or discontinue the Plan at any time. . . ." [See Plaintiffs' Ex. 28, 29, 34, 35, 36 and Defendant's Ex. 3.]

As further support of their view that they are entitled to life-time paid medical insurance, Plaintiffs point to annual statements of benefits provided to salaried employees. Such benefits statements advised the employee, "If you retire from active service as a salaried employee, the Company will pay the cost of the group retiree medical insurance plan for you and your eligible dependents." [See Plaintiffs' Ex. 31, document 002140.][11] Plaintiffs also rely upon the Fruehauf Industrial Relations Manual [Plaintiffs' Ex. 30]. This internal Industrial Relations Manual, was issued in 1981 and used from April 1, 1981, forward. The section of this manual captioned "Continuation of Group Medical Insurance For Salaried Employees Upon Retirement" provides that "[i]f you retire from Active Service under the Salaried

Retirement Plan on or after January 1, 1979, your Medical Insurance will be continued for you and your eligible dependents." That same section later discusses medical benefits for surviving spouses of deceased retirees, stating that "[t]his coverage includes eligible dependents and will continue for life unless your surviving spouse remarries."

Further, with respect to those particular Plaintiffs who retired under a Special Early Retirement Program ("SERP"), Plaintiffs point to the SERP memoranda announcing the program. The SERP memoranda issued in 1982, 1986, and 1987 all stated that "Special Early retirees and their eligible dependents are entitled to Company paid Group Medical Insurance." [See Plaintiffs' Ex. 39–41.] The SERP memorandum issued in 1988 provided that "[a]s with other types of retirement, participants retiring under the Accrued Retirement Program and their eligible dependents are entitled to the Retiree Medical Insurance." [See Plaintiffs'. Ex. 41–43.]

### 2. ORAL REPRESENTATIONS ALLEGEDLY MADE TO PLAINTIFFS BY FRUEHAUF OFFICIALS CONCERNING MEDICAL BENEFITS

In addition to the written materials described above, Plaintiffs contend that certain oral representations made to them by Fruehauf officials in positions of authority also bear upon the terms of the Plan. In essence, Plaintiffs claim that statements made to them evidence a practice by Fruehauf of assuring its employees that they

---

**11.** Although Plaintiffs also claim that these benefits statements also advised the recipient that their medical benefits were "fully vested," Plaintiffs misread the statements. The notification that "Our records indicate that you are fully vested in this benefit" relates only to monthly retirement income (i.e., a vested pension). No such vesting notation follows the separately captioned portions of the benefits statements addressing Hospital and Medical Benefits, Major Medical Plan, Dental Benefits, Disability Income Benefits, Death Benefits, or Paid Vacation and Holiday Benefits. See Ex. 31.

would be provided medical benefits for life at company expense.

Plaintiff, Robert Butler, Fruehauf's former Director of Insurance and Risk Management, retired from Fruehauf in 1988. He testified at his deposition that various high-ranking Fruehauf employees represented to him on several occasions while he was still working for Fruehauf that the company intended to continue retiree medical benefits for life. Butler testified that he was told by Richard Helwig, former VicePresident for Industrial Relations,[12] that human relations counselors should be instructed to advise employees that their health insurance would be provided for life at company expense. [Butler Dep., Plaintiffs' Ex. 4, p. 92.] Butler further stated that, consistent with these instructions, he advised retirees at their exit interviews that company-paid medical insurance would be provided for life. *Id.* at 87–88.

Butler also said that Richard Hale, Director of Employee Benefits in the Industrial Relations Department told him in an October 1988 conversation that retiree medical benefits were provided for life. *Id.* at 18–19, 90. Butler said he also had conversations from 1981 through 1988 with Howard Emorey, Fruehauf's Vice–President and Treasurer, in which Mr. Emorey advised that retiree medical benefits were for life. *Id.* at 95–96. (During this period, Butler was reporting to Emorey. *Id.* at 10–11.)

Butler further testified that his own decision to retire under the 1988 SERP followed a conversation with Richard Darke, Fruehauf's Vice–President and General Counsel. According to Butler, he was ad-

vised by Darke that his medical insurance could never be taken away from him. *Id.* at 102–05.

Plaintiff Donald Armbruster also testified that he accepted early retirement pursuant to the October 1988 SERP based in part upon his understanding that medical benefits would be for life. He testified that he had a discussion he had with Thomas Nanos, Fruehauf's Vice–President of Sales and Marketing, in which he indicated that he was going to accept early retirement explaining "how can I turn this down, lifetime medical benefits which give me security in this area," and Nanos never contested Armbruster's understanding of his retirement benefits. [*See* Armbruster Dep., Plaintiffs' Ex. 2, pp. 44–45].

Armbruster stated that while he was employed at Fruehauf, his supervisor, Bob Hawkins, had assigned him the responsibility of explaining the SERP retirement program to certain designated employees who qualified for early retirement.[13] He testified that Hawkins instructed him to tell prospective early retirees that they would be provided medical insurance for life at company expense. *Id.*, p. 40. Armbruster further testified that he was given a "green slip," which included names of employees to whom Armbruster was supposed to speak and instructed him as to what he was supposed to say. *Id.* at 41. According to Armbruster, the green slip said that benefits were for life. *Id.*[14] Armbruster said that he, accordingly, told potential early retirees that their medical benefits would be continued for life. *Id.* at 43.

---

12. Helwig left Fruehauf in 1986.

13. The record does not indicate precisely what position Armbruster held, but only that he was provided information about benefits that he was expected to pass along to other employees.

14. Armbruster has not produced this "green slip"; he testified at his deposition that he threw it away.

Plaintiff Maynard Brandt retired under Fruehauf's regular retirement plan. Brandt testified in his deposition that, in September 1981, shortly before his retirement, Don Small, Fruehauf's Akron branch manager,[15] advised him that his Fruehauf medical benefits would be continued after he retired. [See Brandt 8/20/98 Dep., Defendant's Ex. J, pp. 13–19.][16] After Brandt left Fruehauf, he went to work for another company which also had a health care plan, but he testified that he elected not to participate in it, "Because I had one with Fruehauf." [See Brandt 2/23/95 Dep., Plaintiffs' Ex. 3, p. 40.]

Plaintiff John Gustke took early retirement from Fruehauf pursuant to the SERP offered by the company in 1982. He testified that he was told by Robert Butler that he would receive medical benefits for life. [See Gustke Dep., Plaintiffs' Ex. 6, pp. 37–38.] Gustke said he also talked with his supervisor, Mr. Neumann, who had decided to retire at the same time, about the lifetime nature of benefits. Id. at 42. Gustke said he and Neumann "both took early retirement because we were reasonably sure that we were covered for life with the insurance." Id.

Plaintiff William Varney retired pursuant to Fruehauf's 1988 Special Early Retirement Plan. Varney testified that he was initially reluctant to accept the SERP offer, but he later spoke with his supervisor, George Walker, who explained that, although the company could not offer him additional money, it was offering free medical insurance for Varney and his wife. See Varney Dep., Plaintiffs' Ex. 13, pp. 22, 24. Based upon that conversation with George Walker, Varney decided to accept the early retirement offer. Id. at 22.[17]

### III. PROCEDURAL HISTORY OF THE INSTANT ACTION

As indicated, the instant action is Plaintiffs' second attempt to recover life-time, paid medical insurance benefits which they claim they were promised by their former employer. This second action was filed after their first action was administratively dismissed without prejudice as a result of Fruehauf Trailer Company's filing for bankruptcy. As indicated above, FTC did not emerge from Chapter 11 bankruptcy and the company was ultimately liquidated. With the liquidation of the company imminent, on January 31, 1997, FTC notified Fruehauf retirees that it would cease providing them with medical insurance coverage effective April 15, 1997.

15. Brandt worked at the Akron branch of the company.

16. Although in his 1998 deposition Brandt did not testify that he was told that he would be provided lifetime company-paid medical, in his previous February 23, 1995 deposition in the Fuller action, Brandt testified that Small told him that Fruehauf would pay for his health insurance for "the rest of your life." [See Brandt Dep., Plaintiffs' Ex. 3, pp. 22, 25–27.] Brandt has submitted a Declaration stating that if he is called to testify at trial in this action, he would testify as he testified in my February 23, 1995 deposition taken in the Fuller case. [See Plaintiffs' Ex. 3, p. 1.]

17. There is no evidence of record concerning any oral representations made to the remaining two named Plaintiffs Robert Rawlings, who retired under the 1987 SERP and Harold Messacar, who retired under Fruehauf's standard retirement program. Rawlings admitted in his deposition that he had no conversations with any company representatives concerning the benefits he would receive after he retired. See Rawlings Dep., Plaintiffs' Ex. 11, p. 28. Neither party has submitted any testimony by Harold Messacar. However, in his deposition taken in the Fuller case, Messacar was unable to cite to any particular statement that led him to believe that he would be provided medical benefits for life upon his retirement. See Fuller, supra, 168 F.R.D. at 592 n. 6.

However, in early April 1997, K–H Corporation, Fruehauf's successor-in-interest after the sale of its trailer and maritime divisions, notified Fruehauf retirees that, effective April 15, 1997 it would provide Fruehauf retirees with medical insurance coverage upon the cessation of their coverage by FTC. Seven months later, on November 21, 1997, Plaintiffs initiated the instant action against K–H Corporation asserting essentially verbatim the same ERISA and RICO claims they had asserted in their 1994 action against FTC. *See* Complaint, ¶ 8.

Discovery in the instant action proceeded through August 1998 and in February 1999, following a status conference with counsel for the parties, the parties' motions for summary judgment and for class certification were dismissed without prejudice and the case closed subject to reinstatement if the parties' attempts to resolve the matter through extra-judicial facilitation proved unsuccessful. In January 2001, after having been advised by the parties that they could not reach an extra-judicial resolution of their dispute, the Court reinstated the case and the pending motions for summary judgment and class certification to the Court's docket. Following their notification of their inability to resolve the case extra-judicially, the parties filed supplemental briefs in support of their respective summary judgment arguments.

## IV. *DEFENDANT'S SUMMARY JUDGMENT ARGUMENTS*

Defendant K–H has moved for summary judgment and dismissal of Plaintiffs' three-count ERISA and RICO Complaint in its entirety. First, Defendant argues that Plaintiffs' ERISA claims in Count I are either barred by the applicable statute of limitations or are without legal merit under the Sixth Circuit's 1998 *en banc* decision in *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir.1998), *cert. denied,* 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998). Additionally, Defendant argues that because it did not make any of the alleged fraudulent statements upon which Plaintiffs rely in Counts I and II of their Complaint, Plaintiffs' Count I claims of estoppel and breach of fiduciary duty and their RICO claims in Count II should be dismissed. Defendant also argues that Plaintiffs' RICO claim in Count II should be dismissed because Plaintiffs have failed to establish the requisite elements of a § 1962(c) RICO and have failed to show a pattern of racketeering activity. Finally, Defendant contends that it is entitled to summary judgment on Plaintiffs' additional ERISA claim in Count III because it did not make any of the alleged misrepresentations regarding Plan costs.

## V. *DISCUSSION*

### A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's

burden on a summary judgment motion.[18] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here

the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding Defendant's Motion for Summary Judgment in this case.

## B. PLAINTIFFS' CLAIMS IN COUNT I OF THEIR COMPLAINT ARE TIME-BARRED

Defendant K–H first argues that Plaintiffs' ERISA claims in Count I of their Complaint are time-barred. Count I of the Complaint has two components: a denial of benefits component under 29 U.S.C. § 1132(a)(1)(B) and a breach of fiduciary duty component under 29 U.S.C. §§ 1109 and 1132(a)(3). Plaintiffs admit that "the claims alleged in this Complaint also were alleged in the action formerly pending in this Court [against Fruehauf Trailer]." *See* Complaint ¶ 8. The new Complaint merely re-alleges the claims Plaintiffs previously asserted against FTC by now alleging them against K–H Corporation.

With respect to the pertinent factual allegations, while in the previous action Plaintiffs alleged that *Fruehauf Trailer* violated ERISA by modifying its Salaried Retiree Medical Benefits Plan in 1990 so that retirees were no longer provided health insurance at company expense, *see Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588, 593–94 (E.D.Mich.1996), in the

---

18. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

Complaint presently before the Court, Plaintiffs allege that Fruehauf Trailer *"act[ed] in concert with defendant K–H and as its agent"* when it "announced that effective January 1, 1990, all retirees, their spouses and dependents · would be required to pay a portion of the monthly cost of the retiree medical benefit plan," *see* Complaint ¶¶ 18, 19, 28A–E, 29, and that these "acts of defendant K–H and Fruehauf Trailer Corporation... were wrongful and violated ERISA." Complaint ¶ 20.

### 1. *BREACH OF FIDUCIARY CLAIMS*

With respect to breach of fiduciary claims, ERISA provides a three-year statute of limitations. *See* 29 U.S.C. § 1113; *Farrell v. Automobile Club of Michigan,* 870 F.2d 1129, 1131 (6th Cir.1989). 29 U.S.C. § 1113 provides as follows:

### § 1113. Limitation of actions

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

■ Plaintiffs do not dispute that they had actual knowledge that the alleged promises of life time medical benefits made to them prior to their retirement were breached as of January 1, 1990 when retiree contributions were first mandated. They argue, however, that they did not know that they had a cause of action against K–H until they received the correspondence from K–H on May 27, 1997, after FTC stopped providing them medical coverage, advising them that "K–H is a successor to FTC" and that "K–H will continue to provide you with coverage, on the same terms and conditions that FTC provided coverage to you on April 15, 1997." [*See* Plaintiffs' Ex. 26.] Plaintiffs maintain that prior to that time, K–H concealed its identity as a liable party with respect to providing Fruehauf retiree medical insurance.

■ However, the evidence shows that what Plaintiffs rely upon in support of their "fraudulent concealment" argument is merely evidence that K–H did not disclose until discovery in this action which shows that K–H was aware during the pendency of FTC's bankruptcy that, if FTC failed to perform the obligation it had assumed with respect to old Fruehauf employee benefits under the Assumption Agreement, K–H might be a potential target for suit by Fruehauf retirees. [*See* Plaintiffs' Ex. 16–23.] This is not fraudulent concealment. "There must be actual concealment—i.e., some trick or contrivance intended to exclude suspicion and prevent inquiry.... Concealment by mere silence is not enough." *Larson v. Northrop Corp.,* 21 F.3d 1164, 1173 (D.C.Cir. 1994). *See also, In re Unisys Retiree Medical Benefit "ERISA" Litigation,* 242 F.3d 497, 502 (3rd Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 542, 151 L.Ed.2d 420 (2001) (the "fraud or concealment" provision in Section 1113 codifies the common law equitable estoppel fraudulent concealment doctrine and requires "affirmative steps by the fiduciary to hide

the breach of fiduciary duty.") *Accord, Adams v. City of Detroit,* 232 Mich.App. 701, 707, 591 N.W.2d 67, 70 (1998), *lv. denied,* 461 Mich. 949, 607 N.W.2d 721 (2000) (to bar use of statute of limitations under an equitable estoppel theory based upon fraudulent concealment, plaintiff must produce evidence of "conduct clearly designed to induce the plaintiff to refrain from bringing action within the period fixed by statute." *Id.,* quoting *Lothian v. Detroit,* 414 Mich. 160, 177, 324 N.W.2d 9 (1982)).

In this case, Plaintiffs' "evidence" amounts to nothing more than "mere silence," which, as noted above is insufficient to establish fraudulent concealment. Evidence that Defendant K–H was aware that it might be sued does not show that Defendant took affirmative steps to hide any alleged breach of fiduciary duty. Defendant was under no obligation to invite Plaintiffs to sue. In short, nothing was "concealed."

Further, to the extent that Plaintiffs contend that, prior to May 1997, they had no reason to doubt that all liabilities relating to retiree medical benefits were transferred to FTC/Terex as part of the sale of Fruehauf's trailer division to Terex, it is black letter law that

> Unless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor.

Restatement 2d Contracts, § 318(3). *See also, Davidson v. Madison Corp.,* 257 N.Y. 120, 125, 177 N.E. 393, 394 (1931) (the act of delegation does not relieve the delegant of the ultimate responsibility to see that the obligation is performed. If the delegate fails to perform, the delegant remains liable.) [19]

Here, there is nothing to indicate that Fruehauf retirees (i.e., the "obligees") ever agreed to discharge K–H [old Fruehauf Corporation] (the "obligor") with respect to its duties and liabilities relating to retiree medical benefits. Therefore, through the exercise of due diligence, Plaintiffs should have known that they could have joined K–H in the suit they filed suit against FTC in 1994.

For the foregoing reasons, the Court finds that Plaintiffs are not entitled to the extended fraudulent concealment "six-years-from-date-of-discovery" limitations period. Applying the provisions of Section 1113 to Plaintiffs' breach of fiduciary duties claims in Count I, which are predicated upon Defendant's alleged misrepresentations made to Plaintiffs by Fruehauf that the they would be provided company-paid medical benefits for life, the Court finds that these claims are time-barred.

■ As indicated, Section 1113 requires that ERISA actions for breach of fiduciary duties be brought by *the earlier of* (1) six years after the date of the last action which constituted a part of the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation. Here, Plaintiffs all admitted in their depositions that they had actual knowledge of Defendant's alleged breach of fiduciary duties as of January 1, 1990 when retiree contributions were first mandated. Therefore, to have been timely filed pursuant to 29 U.S.C. § 1113(2), Plaintiffs would have had to have filed their Complaint by Janu-

---

**19.** The Assumption Agreement provides that it is to be governed by, and construed in accordance with, the laws of the State of New York.

ary 1, 1993. However, Their Complaint was not filed until November 21, 1997, i.e., more than four years after the Section 1113(2) period of limitations had expired.[20]

**20.** Even if the Court were to apply the six-year period "from the date of the last action which constituted the breach" of fiduciary duty provided in subsection (1) of Section 1113, Plaintiffs breach of fiduciary claims would still be time-barred. The "last action" addressed in Section 1113(1) focuses on the last action of the fiduciary which was in violation of its fiduciary duty. *In re Unisys Retiree Medical Benefit "ERISA" Litigation, supra,* 242 F.3d at 505–506. In this case, the breach of fiduciary duty complained of by Plaintiffs in Count I of their Complaint occurred when Fruehauf allegedly misrepresented to them that "retiree medical benefits would be for life [and] at no cost in order to induce their retirement." *See* Complaint, ¶ 20(E)-(F).

As the court explained in *In re Unisys Retiree Medical Benefit "ERISA" Litigation, supra,* given that

> [a]n employee may recover for a breach of fiduciary duty if he or she proves that an employer, acting as a fiduciary, made a material misrepresentation... about his or her benefits, and the beneficiary acted thereupon to his or her detriment[,] ...
> ... it necessarily follows that any breach that may have occurred and was completed, and a claim based thereon accrued, no later than the date upon which the employee relied to his detriment on the misrepresentations.

242 F.3d at 505–506 (citations omitted).

Accordingly, the *Unisys* court determined for the plaintiffs who had purportedly retired based upon Unisys' alleged express assurances that they would have guaranteed company-paid lifetime healthcare, the six-year period of limitations commenced no later than the dates upon which they retired. *Id.*

As noted, Plaintiffs here testified that their decisions to retire were based, at least in part, upon representations made by Fruehauf that they would be provided company-paid medical benefits for life. Plaintiff Brandt retired in 1981; Plaintiff Gustke retired in 1982; Plaintiff Messacar retired in 1985; Plaintiff Rawlings retired in 1987; and Plaintiffs Armbruster, Varney and Butler retired in October 1988. Applying Section 1113(1)'s six-year pe-

For the foregoing reasons, the Court finds that Defendant is entitled to summary judgment on Plaintiffs' Count I breach of fiduciary claims.

riod of limitations to the claims of these Plaintiffs, to have been timely filed, Plaintiffs' Complaint would have had to have been filed no later than October 1994.

To the extent that Plaintiffs argue that the Court should construe the "last action" addressed in Section 1113(1) as encompassing the last of the 1990–1994 changes to the medical benefit plan such that their breach of fiduciary claim did not accrue under this six-year period of limitations until the Fruehauf medical insurance plan was last changed, any such claim would be entirely without merit. As the Supreme Court has repeatedly emphasized, an employer does not act as a fiduciary when it adopts, modifies or terminates an employee benefit plan. *See Lockheed Corp. v. Spink,* 517 U.S. 882, 889, 116 S.Ct. 1783, 1789, 135 L.Ed.2d 153 (1996); *Varity Corp. v. Howe,* 516 U.S. 489, 505, 116 S.Ct. 1065, 1074, 134 L.Ed.2d 130 (1996); *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995). As the *Lockheed* Court explained:

> This rule is rooted in the text of ERISA's definition of fiduciary. See 29 U.S.C. § 1002(21)(A).... [O]nly when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration, does a person become a fiduciary under § 3(21)(A). Because the defined functions in the definition of fiduciary do not include plan design, an employer may decide to amend an employee benefit plan *without being subject to fiduciary review.*

517 U.S. at 890, 116 S.Ct. at 1789 (citations and some punctuation omitted; emphasis added). *See also, Sprague v. General Motors Corp.,* 133 F.3d 388, 404 (6th Cir.1998) (affirming district court's dismissal of the plaintiffs' breach of fiduciary claims predicated upon GM's decision to change its health insurance plan because GM did not act as a fiduciary in making that decision).

Since the various 1990–1994 amendments of the Fruehauf medical benefits plan here were non-fiduciary acts, they cannot constitute the "last action" that gives rise to breach of fiduciary cause of action.

## 2. DENIAL OF BENEFITS CLAIMS

■ Plaintiffs' denial of benefits claims in Count I are similarly time-barred. With respect to claims to recover benefits under § 1132(a)(1)(B), ERISA does not provide a statute of limitations. Such claims are governed by the most analogous state statute of limitations, which is that for breach of contract. *Meade v. Pension Appeals & Review Comm.*, 966 F.2d 190, 194–95 (6th Cir.1992); *Santino v. Provident Life and Acc. Ins. Co.*, 276 F.3d 772, 776 (6th Cir.2001); *Shofer v. Hack Co.*, 970 F.2d 1316, 1319 (4th Cir.1992); *Lang v. Aetna Life Ins. Co.*, 196 F.3d 1102, 1104–05 (10th Cir.1999). The Michigan breach of contract statute of limitations is six years. *See* M.C.L. § 600.5807(8) (2000).

■ Although the statute of limitations may be borrowed from state law, federal law establishes when an ERISA claim "accrues," i.e., begins to run. *Michigan United Food and Commercial Workers Unions and Drug and Mercantile Employees Joint Health and Welfare Fund v. Muir Co., Inc.*, 992 F.2d 594, 598 (6th Cir.1993); *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 341 (D.C.Cir.1991); *Northern Cal. Retail Clerks Unions & Food Employers Joint Pension Trust Fund v. Jumbo Markets, Inc.*, 906 F.2d 1371, 1372 (9th Cir.1990).[21] The "discovery rule" is the general rule of accrual in federal question cases, *see Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir.1990), *cert. denied*, 501 U.S. 1261, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991), and as such, is applied in ERISA actions. *See Michigan United Food and Commercial Workers Unions, et al. v. Muir Co., Inc.,*

*supra; Northern Cal. Retail Clerks Unions & Food Employers Joint Pension Trust Fund v. Jumbo Markets, Inc., supra.* Under the discovery rule, an ERISA claim accrues and the limitations period begins to run when the "plaintiff discovers, or with due diligence should have discovered, 'the injury that is the basis of the action.'" *Commercial Workers Unions, supra*, 992 F.2d at 597(quoting *Connors v. Hallmark & Son Coal Co., supra*). *See also, Union Pacific Railroad Co. v. Beckham*, 138 F.3d 325 (8th Cir.1998), *cert. denied*, 525 U.S. 817, 119 S.Ct. 56, 142 L.Ed.2d 43 (1998) (consistent with the discovery rule, the general rule in an ERISA action is that a cause of action accrues after a claim for benefits has been made and denied.)

As indicated, Plaintiffs admit that they understood as of January 1, 1990 that any promise of lifetime retiree medical benefits had been breached when, in their words, FTC as agent of K–H, announced that effective January 1, 1990, all retirees, their spouses, and dependents would be required to pay a portion of the retiree medical benefit plan. *See* Complaint, ¶ 18. Notwithstanding their admitted knowledge of Defendant's alleged breach in 1990, Plaintiffs argue that their denial of benefits claims are not time-barred.

Relying upon a Michigan Court of Appeals decision, *Adams v. City of Detroit*, 232 Mich.App. 701, 591 N.W.2d 67 (1998), *lv. denied*, 461 Mich. 949, 607 N.W.2d 721 (2000), Plaintiffs argue that their claims here should be likened to installment contracts, such that the deficient provision of

---

**21.** In *Michigan United Food and Commercial Workers Unions, et al. v. Muir Co., Inc., supra,* the Sixth Circuit noted that this does not appear to be the rule in the Third Circuit where courts appear to apply both state statutes of limitations and state accrual and tolling principles. 992 F.2d at 598 (citing *Sheet Metal Workers Local 19 v. 2300 Group, Inc.,* 949 F.2d 1274 (3d Cir.1991); *Connors v. Beth Energy Mines, Inc.,* 920 F.2d 205 (3d Cir. 1990); and *Vernau v. Vic's Market, Inc.,* 896 F.2d 43 (3d Cir.1990).) The *Muir* court expressly refused to follow Third Circuit in this regard.

medical benefits each month gave rise to a new claim, and that, at a minimum, they should be entitled to recover for all deficient benefits that were payable during the period beginning six years before suit was filed.

In *Adams*, early retirees from the City of Detroit sued the city for failure to provide them with health insurance benefits which, pursuant to city council resolution, the City was obligated to provide.[22] the Michigan Court of Appeals reversed the trial court's grant of summary disposition in favor of the City of Detroit, finding that the plaintiffs' state law breach of contract claims were barred by the statute of limitations. The appellate court determined that the trial court erred in ruling the plaintiffs' claims were entirely barred by the statute of limitations holding that, like an installment contract, each deficient payment of benefits marked the time from which a separate breach of contract accrues. 232 Mich.App. at 709, 591 N.W.2d at 71. Therefore, the court reversed and remanded the case to the trial court instructing that "plaintiffs may pursue their claims for any unprovided benefits dating from six years before plaintiffs filed suit." *Id.*

*Adams*, however, represents Michigan state law regarding the accrual of a state law breach of contract claim based upon an installment contract theory. *See* M.C.L. § 600.5836 which provides that "claims on an installment contract accrue as each installment falls due." As indicated above, it is federal law, *not* state law, that establishes when an ERISA claim "accrues." *See Michigan United Food and Commercial Workers Unions and Drug and Mer-*

*cantile Employees Joint Health and Welfare Fund v. Muir Co., Inc., supra; Northern Cal. Retail Clerks Unions & Food Employers Joint Pension Trust Fund v. Jumbo Markets, Inc., supra.*

Although the Sixth Circuit has not been called upon to consider an installment contract theory of accrual of an ERISA denial of benefits claim, the Tenth Circuit squarely addressed this issue in *Lang v. Aetna Life Ins. Co.*, 196 F.3d 1102 (10th Cir. 1999). In *Lang*, the plaintiff brought an ERISA action to recover disability benefits. The court determined that the applicable "most analogous" state statute of limitations (Utah's three-year statute of limitations for breach of insurance contracts) was triggered by the defendant's 1991 determination that Ms. Lang was no longer entitled to total disability benefits. Because this was more than three years before Lang filed her complaint, the district court found that her action was time-barred. However, like the Plaintiffs here and the plaintiffs in *Adams*, the plaintiff in *Lang* attempted to characterize her denial of disability benefits as an action on an installment contract. She claimed that her suit was timely because a separate statute of limitations ran against each unpaid monthly benefit. The Tenth Circuit rejected Lang's argument stating:

> Under plaintiff's characterization, her claim would have an indefinite lifespan. Such a result would undermine the overriding purpose of a statute of limitations. Time limits are essential to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. Since the three-year

---

22. The city had initially regarded the resolutions as applying only to conventional retirees, not those taking advantage of the city's "40 & 8" early retirement program. In 1989, the Michigan Court of Appeals ruled that re- tirees under the "40 & 8" plan were fully entitled to the health insurance benefits. *See Clexton v. Detroit*, 179 Mich.App. 209, 445 N.W.2d 201 (1989). The *Adams* suit followed the *Clexton* decision.

limitation applies to this suit, and inception of the loss occurred in 1991, we affirm.

196 F.3d at 1105 (citations and internal quotation marks omitted).

The Court finds the Tenth Circuit's reasoning persuasive. The Sixth Circuit has recognized the same policies underlying statutes of limitations which persuaded the *Lang* court to reject the plaintiff's installment contract accrual theory. *See, e.g., Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1135 (6th Cir. 1995) (policies furthered by statutes of limitations include encouraging plaintiffs to pursue claims diligently and protecting defendants from stale claims); *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1128 (6th Cir.1982) ("Statutes of limitations are vital to the welfare of society and are favored in the law. Stale conflicts should be allowed to rest undisturbed after the passage of time has made their origins obscure and the evidence uncertain." *Id.* (citations omitted)).

By application of the foregoing federal law, the Court finds that Plaintiffs' denial of benefits claims in this case are time-barred. There is no question that Plaintiffs discovered in January 1990 "the injury that is the basis of their action" when they were first required to pay for a portion of the cost of their retiree medical benefits.[23] Accordingly, the six-year statute of limitations began to run at that time. To accept Plaintiffs' characterization of their denial of benefits claim as an "installment contract" would give their claim "an indefinite lifespan" and run contrary to the policies underlying statutes of limitations.

Plaintiffs did not file their Complaint in this action until November 21, 1997. This was more than a year and a half after the six-year period of limitations had expired. Therefore, the Court finds that, like Plaintiffs' Count I breach of fiduciary duties claims, Plaintiffs' denial of benefits claims are also time-barred. Accordingly, Defendant's motion for summary judgment will be granted on Count I.

## C. THE SIXTH CIRCUIT'S EN BANC DECISION IN SPRAGUE V. GENERAL MOTORS ESTABLISHES THAT PLAINTIFFS' DENIAL OF BENEFITS CLAIMS IN THIS ACTION ARE NOT LEGALLY COGNIZABLE

Even assuming *arguendo* that Plaintiffs' denial of benefits and breach of fiduciary duty claims are timely, the Court finds that Defendant is entitled to summary judgment on the merits of these claims under the Sixth Circuit's *en banc* decision in *Sprague v. General Motors*, 133 F.3d 388 (6th Cir.1998), *cert. denied*, 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998). *Sprague* is factually similar to this case.

In *Sprague*, salaried General Motors retirees sued GM under ERISA claiming that when they retired, they had been promised company-paid health care coverage for life, and that when GM began requiring retirees to pay for a portion of that coverage in 1988, GM violated ERISA. The plaintiffs in *Sprague* advanced the same theories of recovery ad-

---

**23.** Plaintiffs were subsequently notified of four more changes to the medical benefits plan—i.e., in 1991 they were notified of a change in insurance carriers; in 1992 and 1993 the amounts retirees were required to contribute were increased; and in 1994, they were notified of the change to AARP medi-gap insurance for retirees over age 65. Although some of these subsequent changes, such as the medi-gap change, were perhaps different in kind from the 1990 change, they do not change the fact that Plaintiffs had notice of the fundamental substantive change in the terms of the plan as of January 1990.

vanced by Plaintiffs here. The *Sprague* plaintiffs argued that GM (1) committed a breach of the terms of the plan when it implemented the changes in 1988; (2) GM bilaterally contracted with each retiree to vest benefits; (3) was estopped from enforcing the terms of the written plan against them; and (4) committed a breach of fiduciary duty in explaining its retirement program to retirees. The Court of Appeals rejected each of these theories finding no legal merit in any of them. Because of the factual similarity between *Sprague* and the instant action, the Court will address each of these theories in the context of the facts of this case.

1. *THE FRUEHAUF PLAN SUMMARY PLAN DESCRIPTIONS CONTAIN AN EXPRESS RESERVATION OF RIGHTS CLAUSE*

■ In Count I of their Complaint, Plaintiffs claim that Defendant breached the "express terms of the plan that provided for defendant to provide medical benefits for life." Complaint ¶ 20(A). They further claim that Defendant "failed to unambiguously reserve a right to terminate or amend the plan, *id.* at 20(B), and, therefore, such medical benefits are vested and cannot be terminated or modified by Defendant." *Id.* at 20(C). These claims are identical to the claims made by the plaintiffs in *Sprague. See Sprague,* 133 F.3d at 399–402.

As in *Sprague,* the summary plan documents that have been placed in the evidentiary record in this case all contain explicit language reserving Fruehauf's right to modify or terminate the Plan at any time. For example, the 1979 and 1981 SPDs stated, "The Plan Administrator may change or eliminate benefits under the plan and may terminate the entire plan or any portion of it. . . ." The 1983 summary plan description provided, "The Company

intends to continue the Plan indefinitely. However, the Company reserves the right to change the Plan, and if necessary, to discontinue it." The 1985, 1986 and 1987 summaries stated, "The Company has the right to change or discontinue the Plan at any time. . . ." [*See* Plaintiffs' Ex. 28, 29, 34, 35, 36 and Defendant's Ex. 3.]

Plaintiffs argue, however, that because the summaries also told them that their medical insurance would by fully paid by the company for their lifetimes, an ambiguity exists within the summaries that must be resolved by extrinsic evidence.

The Sixth Circuit squarely rejected this argument in *Sprague:* "We see no ambiguity in a summary plan description that tells participants both that terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change." 133 F.3d at 401.

*Sprague* was not the first case in which the Sixth Circuit reached this conclusion. In *Musto v. American General Corp.,* 861 F.2d 897 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989), the appellate court reversed a grant of preliminary injunction entered in favor of a group of retirees in an ERISA action. The plaintiffs in *Musto* were retirees of National Life and Accident Insurance Company. National Life was subsequently acquired by American General. After the acquisition, National Life retirees were required to pay a portion of their medical benefits. The retirees subsequently brought suit under ERISA to block American General's retiree contribution requirement.

As in this case, the National Life SPDs in *Musto* contained both a promise of company-paid retiree medical insurance and a termination/modification clause expressly reserving the employer's right to amend

and terminate the medical benefit plan.[24] The district court found that these provisions conflicted and, therefore, construed them so as to avoid the negative impact of the termination/modification clause. ("To read the plan as providing lifetime paid up medical insurance and, at the same time, reserving the right to terminate the benefits at any time constitutes an illusory promise—an express unqualified grant of a right negated by an express unqualified reservation of the right to terminate the grant." *Musto*, 861 F.2d at 905, quoting the district court's decision, *Musto v. American General Corp.*, 615 F.Supp. 1483, 1499 (M.D.Tenn.1985).) Based upon that construction, the lower court held that the plaintiff-retirees had sustained their burden of showing the requisite likelihood of success on the merits of their claim that the changes made by their employer by requiring them to pay a portion of their retiree medical insurance coverage was impermissible.

The Court of Appeals reversed the district court's decision, explaining:

> [I]t seems to us that the district court erred, as a matter of law, in determining that the provisions of the plan summaries cannot be reconciled with one another. Our understanding of what the summary plan descriptions say is this:
>
> 1. Here is a plain-English summary of the group insurance plan for employees of National Life.
>
> 2. The plan provides medical insurance coverage for eligible employees.
>
> 3. The plan provides for continuation of medical coverage after retirement.
>
> 4. The plan does not require contributions for continued medical coverage after retirement.
>
> 5. The company reserves the right to change the plan.
>
> To read this summary as saying that the plan can never be changed in such a way as to mandate retiree contributions for continued medical coverage is to read into the summary something its authors did not put there (a promise to provide lifetime "paid up" medical insurance), while reading out of the summary something that clearly was put there (an express reservation of the right to change the plan). Such a reading violates the basic principle that each provision of a contract should be interpreted as part of an integrated whole, to the end that all of the provisions may be given effect if possible.
>
> Wherein lies the supposed conflict in the summary plan description booklets?
>
> — Each booklet, as far as we can see, did accurately summarize the main features of the group insurance policy as in effect at the time the booklet was issued;
>
> — The group insurance policy did, at all times, provide medical coverage for eligible employees;
>
> — The policy did, at all times, provide for continuation of medical coverage after retirement;
>
> — Medical coverage was in fact continued for each retiree, regardless of insurability, as long as the retiree complied with the conditions of the policy;
>
> — When the policy called for contributions from certain retirees, as it did in the 1960s, the booklets said so. When the policy did not call for contributions from any retiree, the booklets said that too. No booklet ever said that the policy would not be changed in the future to

---

**24.** The American General medical insurance plan had originally required employee and retiree contributions. The contribution requirement was subsequently eliminated.

However, after National Life was acquired by American General in 1984, National Life employees and retirees were again required to pay a portion of their medical insurance.

require contributions for continued coverage,

— and when the company made such a change in 1984, it was doing something that the booklets had said all along it had the right to do.

861 F.2d at 906 (footnote and citations omitted).

Virtually every circuit has reached the same conclusion. *See e.g., In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation,* 58 F.3d 896, 904 n. 12 (3rd Cir.1995) (court determined that the promise made to retirees was a qualified one: the promise was that retiree medical benefits were for life provided the company chose not to terminate or amend the plans pursuant to the company's reservation of rights); *DeGeare v. Alpha Portland Indus., Inc.,* 652 F.Supp. 946, 961 (E.D.Mo. 1986), *aff'd,* 837 F.2d 812 (8th Cir.1988), *vacated and remanded on other grounds,* 489 U.S. 1049, 109 S.Ct. 1305, 103 L.Ed.2d 575 (1989), (interpretation of plan documents to provide lifetime benefits subject to the employer's reserved right to amend was "harmonious and reasonable"); *Anderson v. Alpha Portland Indus., Inc.,* 836 F.2d 1512, 1518 (8th Cir.1988), *cert. denied,* 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989) (plaintiffs did not meet their burden of proving vested welfare benefits where an employer promised to provide welfare benefits "until death of retiree" where the employer had expressly reserved the right to terminate or amend the plan); *Alday v. Container Corp. of America,* 906 F.2d 660 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991) (where summary plan description also clearly provided that retiree health insurance could be terminated or modified, these terms of description were controlling); *Gable v. Sweetheart Cup Co., Inc.,* 35 F.3d 851, 856 (4th Cir.

1994), *cert. denied,* 514 U.S. 1057, 115 S.Ct. 1442, 131 L.Ed.2d 321 (1995) (same).

Based upon for the foregoing authorities, the Court finds that no ambiguity exists in the SPDs by virtue of the inclusion of both promises of company-paid medical benefits for life and a clear, unambiguous reservation of right to modify or terminate the plan—including the payment of medical benefits—at any time.

■ Plaintiffs further argue that because not all of the SPDs specifically spoke to a *retiree* medical plan, an ambiguity exists as to whether the modification/termination provisions were sufficient to terminate promised retiree benefits. Plaintiffs suggest that while the modification/termination provisions may be effective to terminate active employee medical benefits, they are not effective as to retirees. Therefore, they maintain that summary judgment in favor of Defendant on this claim would inappropriate.

As an initial matter, the Court notes the factual deficiency in this argument. As indicated, the SPDs in the evidentiary record include both summary descriptions specifically designated as "retiree medical plan" descriptions and SPDs not so specifically designated. However, both the SPDs captioned as descriptions of the medical plan for salaried employees, and the SPDs specifically designated as covering *retired* salaried employees contain explicit modification/termination provisions. For example, the 1979 SPD is specifically designated as a description of the "Fruehauf Corporation Retired Salaried Employees Medical Plan." It contains the following reservation of rights provision: "The Plan Administrator may change or eliminate benefits under the plan and may terminate the entire plan or any portion of it...." [*See* Plaintiffs' Ex. 28.] The 1986 SPD is also specifically designated as the "Fruehauf Corporation Retired Salaried Employees Medical

Plan." It contains a provision which states, "The Company has the right to change or discontinue the Plan at any time...." [*See* Plaintiffs' Ex. 36.] Thus, there is no factual merit in Plaintiffs' suggestion that no reservation of rights was effective as against retirees.

Furthermore, with respect to applicability of the reservation of rights provisions contained in the SPDs of the medical plan for "active" salaried employees, each of those SPDs specifically include retirees within the class of "employees" covered thereunder. They all provide for the continuation of medical benefits for active employees who "retire from Active Service under the Salaried Retirement Plan on or after January 1, 1979."

Numerous courts, including the Sixth Circuit, have considered and rejected arguments similar to Plaintiffs' argument here. *See e.g., Musto, supra,* 861 F.2d at 902 (holding that a modification clause in an active employee benefit plan applies to retirees as well as to employees where the plan indicates that retirees will be considered employees for the purposes of the plan); *Gable, supra,* 35 F.3d at 856 (terms of plan established that retirees were within the class of employees covered by the plan). This is particularly true, where as here, the modification clauses contain no language limiting their applicability to only "active" employees. *Id.*

In sum, the Court finds no merit in Plaintiffs' claim that, under the terms of the plan, they had a "vested" right to company-paid medical benefits and that Defendant violated the terms of plan by requiring Plaintiffs to pay for a portion of their medical coverage. Accordingly, summary judgment will be entered in favor of Defendant on this claim.

## 2. BILATERAL CONTRACT THEORY

Plaintiffs also alleged in their Complaint a "bilateral contract theory" claiming that statements, promises and representations made to them by Fruehauf officials in connection with the company's retirement programs, created binding bilateral contracts which provided for vesting of company-paid medical benefits for life. Adhering to the well-established principle that "clear terms of a written employee benefit plan may not be modified or superseded by oral undertakings on the part of the employer", this bilateral contract theory was also expressly rejected in *Sprague.* 133 F.3d at 402–403 (citing *Musto, supra.*) In light of *Sprague*'s holding on this issue, Plaintiffs here concede that the bilateral contract theory pled in their Complaint is no longer viable. *See* Plaintiffs' Response Brief, p. 31. Therefore, the Court will grant Defendants' motion for summary judgment on this claim.

## 3. PLAINTIFFS' ESTOPPEL ARGUMENT IS NOT VIABLE

Plaintiffs' third theory alleged in Count I of their Complaint is that K–H is barred by promissory or equitable estoppel from requiring them to pay for medical benefits. They argue that Fruehauf misrepresented the medical plan's terms to them, i.e., that they would have fully-paid medical benefits for life, and that they relied upon those alleged misrepresentations in deciding to retire.

The Sixth Circuit has held that equitable estoppel may be a viable theory in ERISA welfare benefit plan cases. *See Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1298 (6th Cir.1991). The elements of equitable estoppel in an ERISA action are as follows: 1) conduct or language amounting to a representation of material fact; 2) awareness of the true facts by the party to be estopped; 3) an intention on the part of the party to be estopped that the representation be acted on, or conduct towards

the party asserting the estoppel such that the latter has a right to believe that the former's conduct be so intended; 4) unawareness of the true facts by the party asserting the estoppel; and 5) detrimental and justifiable reliance by the party asserting estoppel on the representation *Sprague, supra,* 133 F.3d at 403, citing *Armistead, supra.* Promissory estoppel requires similar proof. To establish a claim under a promissory estoppel theory requires proof that 1) the promisor made a specific, clear, and unambiguous promise; 2) the promisor should reasonably have foreseen that his promise would induce reliance by the promisee; 3) the promisee acted or refrained from action to his detriment in actual and reasonable reliance upon the promise at issue; and 4) injustice will result if the promise is not enforced. *See, e.g., Humphreys v. Bellaire Corp.,* 966 F.2d 1037, 1041 (6th Cir.1992); *Cincinnati Fluid Power. Inc. v. Rexnord, Inc.,* 797 F.2d 1386, 1391 (6th Cir.1986); *Motobecane America. Ltd. v. Patrick Petroleum Co.,* 791 F.2d 1248, 1251 (6th Cir.1986).

■ However, as the court in *Sprague* held, "[p]rinciples of estoppel cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions." 133 F.3d at 404. As the *Sprague* court explained,

There are at least two reasons for this [rule]. First, as we have seen estoppel requires reasonable or justifiable reliance by the party asserting the estoppel. That party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available or furnished to the party. Second, to allow estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves. That would not be consistent with ERISA.

*Id.*

■ As was the case in *Sprague,* the summary plan descriptions issued to the Plaintiffs over the years unambiguously reserved to Fruehauf the right to amend or terminate the plan. As the *Sprague* court found, in the face of this clearly stated right to amend, "reliance on statements allegedly suggesting the contrary, was not, and could not be, reasonable or justifiable," as a matter of law. *Id.* This is particularly true, where, as here, Fruehauf never told the Plaintiffs that the plan would never be changed or that their benefits were fully paid-up. *See Musto, supra,* 861 F.2d at 909 (in absence of evidence that plaintiffs were told by their employer that their post-retirement benefits would never be changed, no estoppel claim could be maintained.) [25]

25. To the extent that Plaintiffs' rely upon certain annual statements they received from their employer prior to their retirement summarizing the total annual cost of their welfare and pension benefits and the statement at the end of those benefit summaries that "Our records indicate that you are fully vested in this benefit," [*see* Plaintiffs' Ex. 31], it is clear from the face of these documents that the statement regarding being "fully vested in *this* benefit" refers only to the discussion of "Your *Pension* Benefits at Retirement" which immediately precedes it, *not* to all of the other benefits summarized in the separately-headed categories of benefits listed above that

section, i.e., "Your Hospital and Medical Benefits," "Your Major Medical Plan," "Your Dental Benefits," "Your Disability Income Benefits," "Your Death Benefits," and "Your Paid Vacation and Holiday Benefits." As the Sixth Circuit noted in *Musto, supra,* "[T]he fact that an employee acquires a vested, nonterminable right to pension benefits... does not in any way suggest that the employee acquires a comparable vested right to medical insurance benefits under a welfare plan that does not provide for the vesting of such benefits." 861 F.2d at 909. Furthermore, "references to lifetime benefits contained in non-

## 4. THERE WAS NO BREACH OF FI-DUCIARY DUTY

■ Finally, with respect to Plaintiffs' last theory of recovery in Count I, i.e., that K–H is liable to them for breach of fiduciary·duty based upon Fruehauf representations to them in discussing the company's retirement plans that retiree medical benefits would be for life and at no cost to them, *Sprague* establishes as a matter of law that there was no breach of fiduciary duty in these alleged representations.

A fundamental requirement for Plaintiffs to establish an ERISA breach of fiduciary duty is that they show that the fiduciary made a *mis*representation to its employees about their benefit plan. *See Varity Corp. v. Howe,* 516 U.S. 489, 495, 504, 116 S.Ct. 1065, 1071–73, 134 L.Ed.2d 130 (1996). As indicated, there is no evidence that Fruehauf ever told any of the Plaintiffs that their retiree health care benefits were "vested" or that the health care plan would never be changed. Accepting the Plaintiffs' own sworn testimony about what they were told, all that Fruehauf told them was that their medical insurance would be fully paid by the company for their lifetimes. This was true under the terms of Fruehauf's then-existing plan. As the *Sprague* court observed with respect to identical representations made by GM,

> Explanations of benefits,
> "tend to sound promissory by their very nature. While these explanations may state a company's current intentions with respect to the plan, they cannot be expected to foreclose the possibility that changing financial conditions will require a company to modify welfare plan provisions at some point in the future." *Gable,* 35 F.3d at 857.

plan documents cannot .override an explicit reservation of the right to modify contained in the plan documents themselves." *Gable v.*

GM's failure, if it may properly. be called such, amounted to this: the company did not tell the early retirees at every possible opportunity that which it had told them many times before— namely, that the terms of the plan were subject to change. There is, in our view, a world of difference between the employer's deliberate misleading of employees in *Varity Corp.* [telling them specifically that the employee benefit plan would not change] and GM's failure to begin every communication to plan participants with a caveat.

\* \* \* \* \* \*

We are not aware of any court of appeals decision imposing fiduciary liability for a failure to disclose information that is not required to be disclosed. At least three circuits have held that there is no fiduciary duty to disclose planned changes in benefits or even the termination of the plan before those actions become official. [Citations omitted.] *A fortiori,* there can be no fiduciary obligation to disclose the *possibility* of future changes in benefits . . . .

Had an early retiree asked about the possibility of the plan changing, and he received a misleading answer, or had GM on its own initiative provided misleading information about the future of the plan . . . a different case would have been presented. But we do not think that GM's accurate representations of its current program can reasonably be deemed misleading. GM having given out no inaccurate information, there was no breach of fiduciary duty.

133 F.3d at 405–406 (citations omitted).

■ The foregoing authority establishes that Plaintiffs' Count I breach of

*Sweetheart Cup Co., Inc., supra,* ·35 F.3d at 857.

fiduciary claim in this case is without merit. As was the case with GM in *Sprague,* Fruehauf did not give Plaintiffs inaccurate information concerning retiree medical benefits when they were considering retirement. The information they were given was, at the time it was given, accurate. Fruehauf not having given out inaccurate information, there was no breach of fiduciary duty.[26]

## D. PLAINTIFFS' HAVE FAILED TO ESTABLISH A RICO CLAIM

In Count II of their Complaint, Plaintiffs allege that the letters sent to salaried retirees by FTC [Defendants' Ex. B] advising them that, due to increased health care costs, they would be required to pay a portion of the monthly cost for medical coverage, were fraudulent in that they falsely inflated the projected costs of the plan and as a result retirees were induced to pay higher premiums than necessary. Plaintiffs contend that Defendant K–H is responsible for the statements made in these letters because FTC was acting as its agent when it made these statements and sent these letters to retirees and that, as a consequence, K–H violated the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and (d).

To establish a private RICO action under Section 1962, Plaintiffs must establish that (1) the defendant (2) through the commission of two or more acts, (3) constituting a "pattern" (4) of "racketeering activity", (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate commerce. 18 U.S.C. § 1962(a)-(c). *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). "Racketeering activity" is defined in the statute as including any act "indictable" under certain specifically enumerated federal criminal statutes, including the mail fraud statute, 18 U.S.C. § 1341.

■ It is mail fraud that Plaintiffs here purport to use to support their RICO claim. Mail fraud has two elements: a scheme or artifice to defraud and a mailing for the purpose of executing the scheme. *Bender v. Southland Corp.,* 749 F.2d 1205, 1215 (6th Cir.1984). The "scheme to defraud" must involve "intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." *Id. See also, Epstein v. United States,* 174 F.2d 754, 765 (6th Cir.1949) (scheme to defraud requires intent to deceive or defraud.)

■ Plaintiffs here, however, have not alleged any acts committed by Defendant K–H. Rather, Plaintiffs base their RICO claim against K–H on allegedly fraudulent letters sent by FTC contending FTC was acting "as agent for K–H" when it sent the complained of letters. The sole basis Plaintiffs' agency theory is the following

---

**26.** To the extent that Plaintiffs' breach of fiduciary claim is predicated upon the decision to amend the plan to require employee contributions for health care insurance coverage, as noted above, both the U.S. Supreme Court and the Sixth Circuit have expressly held that a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan. *See* note 20, *supra,* and cases discussed therein. *See also, Sutter v. BASF Corp.,* 964 F.2d 556, 562 (1992) (quot-

ing *Adams v. Avondale Industries, Inc.,* 905 F.2d 943, 947 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990)); *Sengpiel v. B.F.Goodrich Co.,* 156 F.3d 660, 665 (6th Cir.1998), *cert. denied,* 526 U.S. 1016, 119 S.Ct. 1249, 143 L.Ed.2d 347 (1999). Therefore, the decision to require employees to pay for a portion of their health care coverage did not constitute the breach of any fiduciary duty. *Id.* at 666.

language in the Assumption Agreement executed by FTC at the time of its purchase of Fruehauf Company's trailer operations:

> The Purchaser [Terex a/k/a FTC] hereby covenants and agrees that, any time and from time to time following the date hereof, at the request of the Seller [Fruehauf, a/k/a K–H], the Purchaser will promptly execute and deliver, or cause to be executed and delivered to the Seller all such further instruments and take all such further action as may be reasonably necessary or appropriate to more effectively assume the Assumed Liabilities or otherwise to confirm or carry out the provisions and intent of this Assumption Agreement.

Plaintiffs contend that this language "vested in Defendant the absolute right to control the performance of the assumed liabilities." [*See* Plaintiffs' Brief, p. 35].

 While it is true that "the person delegated may be an agent... of the delegating obligor," Restatement 2d Contracts, § 318, comment (b), the delegatee only becomes an agent when the delegating obligor and delegatee agree that the delegatee (agent) will act for the delegator (principal) with the understanding that the principal will "be in control of the undertaking." Restatement 2d Agency, § 1. It is the right to control that is the basis for the agency relationship. *See Martin v. Thrifty Rent A Car*, 145 F.3d 1332, 1998 WL 211786 (6th Cir.1998) (unpublished opinion; text available on WESTLAW). It is not necessary that the principal actually exercise its right to control; it suffices that such a right exist. *General Acquisition, Inc. v. GenCorp, Inc.*, 766 F.Supp. 1460, 1471 (S.D.Ohio 1990), *app. dismissed on other grounds*, 23 F.3d 1022 (6th Cir. 1994).

Contrary to Plaintiffs' contention, the language of the Assumption Agreement that they rely upon does *not*, as they contend, establish that Defendant–K–H was given the "absolute right to control *the performance* of the assumed liabilities." The plain language of the provision which states that "at the request of Seller [K–H], Purchase [FTC] will promptly execute and deliver, or cause to be executed and delivered to the Seller all such further instruments and take all such further action as may be reasonably necessary or appropriate to more effectively assume the Assumed Liabilities," merely addresses FTC's obligation to execute any additional documents and to take additional actions, such as recording or registering appropriate documents with the appropriate agencies, to complete and perfect the assumption transaction. This provision says nothing about monitoring, directing or controlling FTC's performance after the assumption transaction is completed. With respect to FTC's performance of its obligations under the Assumption Agreement, if FTC does not honor its obligations under the Agreement, K–H has no right to step in and direct compliance. K–H's only remedy is a breach of contract action against FTC. *See Kelly v. Diesel Construction Division of Carl A. Morse, Inc.*, 35 N.Y.2d 1, 358 N.Y.S.2d 685, 315 N.E.2d 751, 754 (N.Y.App.1974) (one who delegated duty to another is entitled to recover from the delegate for harm sustained by him because of the delegate's breach of duty).

In sum, the Assumption Agreement is insufficient evidence of the existence of an "agency" relationship between FTC and K–H. The Assumption Agreement provides no evidence of K–H's right to control FTC's performance of its obligations with respect to the assumed liabilities. Therefore, it fails to establish that FTC was acting as K–H's agent when it informed Plaintiffs that increased costs of medical

insurance required that retirees pay a portion of the insurance premiums and provided them with an allegedly inaccurate formula pursuant to which it calculated the amount that retirees would be required to pay.[27]

As the Sixth Circuit observed in *Blount Financial Service v. Walter F. Heller & Co.*, 819 F.2d 151, 152 (6th Cir. 1987), "fraud alleged in a RICO civil complaint for mail fraud must state with particularity the false statement of fact *made by the defendant* which the plaintiff has relied on and the facts showing the plaintiff's reliance on *the defendant's false statement.*" (emphasis added). *See also, Bender v. Southland Corp.*, 749 F.2d 1205, 1215 (6th Cir.1984) (complaint properly dismissed where RICO allegations are inadequate); *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 67 (2nd Cir.1996), *cert. denied*, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996) (RICO claim properly dismissed for failure to plead fraud with particularity.)

Plaintiffs here cannot maintain their RICO claim against K–H absent allegations and proof that K–H made the misrepresentations of which the complain. It is not enough that FTC sent them allegedly fraudulent letters; Plaintiffs must prove that Defendant K–H made, or directed FTC to make, the fraudulent statements contained therein. Plaintiffs have failed to meet this burden.

For these reasons, the Court finds that Plaintiffs have failed to establish the requisite predicate acts of "racketeering activity" needed to support their RICO claim.

Unable to establish this necessary element, Plaintiffs' RICO claim will be dismissed.

### E. PLAINTIFFS' FAILURE TO ESTABLISH THAT FTC ACTED AS AGENT FOR K–H ALSO REQUIRES DISMISSAL OF PLAINTIFFS' COUNT III BREACH OF FIDUCIARY DUTY CLAIM

Finally, in Count III of their Complaint, Plaintiffs allege an "additional violation of ERISA" contending therein that "in misrepresenting the costs of the Plan and retiree premiums during the period of the fall of 1990 through May 1994, and in collecting inflated premiums from retirees, Defendant K–H breached the strict fiduciary duties it owed to Plaintiffs... as a plan administrator and fiduciary under 29 U.S.C. § 1104(a)." [*See Complaint,* ¶ 33.] However, as shown above in Section (D), Plaintiffs have failed to show that any misrepresentations were ever made by Defendant K–H and they have to establish that FTC was acting as K–H's agent at the time that FTC made the allegedly false and misleading statements. Since it is only through their agency argument that Plaintiffs attempt to attach liability to Defendant K–H for their claim in Count III of their Complaint, this claim will also be dismissed.

### CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment

---

**27.** Plaintiffs also attempt to rely upon internal K–H documents dating after 1993, i.e., after FTC filed for bankruptcy, which show that K–H was considering how to handle its potential liability for Fruehauf retiree medical benefits in the event that FTC terminated the benefits, and K–H's ultimate decision in April 1997 to continue to provide retirees medical insurance coverage upon cessation of coverage by FTC. None of this evidence, however, establishes that K–H ever had the right to control FTC's actions prior to FTC's cessation of coverage in 1997.

be, and hereby is, GRANTED. Accordingly,

IT IS FURTHER ORDERED that Plaintiffs' Complaint be DISMISSED with prejudice.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Class Certification is DENIED as moot.

Let Judgment be entered accordingly.